UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>Defendants. | Civil Action No. 25-cv-1051 |

**DECLARATION OF JOSEPH CARLILE**

I, Joseph Carlile, hereby declare as follows:

1. I am currently the managing director and founder of Bluestem Consulting, LLC, a consulting firm in Alexandria, Virginia. In my role as managing director, I lead a specialized consulting practice that provides strategic planning, consulting, advisory, training and education services focused on the Federal budget and appropriations processes.

2. I served on the staff of the Committee on Appropriations, U.S. House of Representatives from December 2007-January 2021. During my tenure on the Committee, I served in various roles, including clerk of the Subcommittee on Transportation, Housing and Urban Development and Related Agencies from January 2019-January 2021. In my capacity as clerk, in conjunction with my counterparts from the majority and minority staff of the House and Senate Committees on Appropriations, I drafted and negotiated the annual appropriations acts for the subcommittee, as well as supplemental appropriations acts for COVID-19 funding and funding for recovery from natural disasters.

1

3.      I served as Senior Advisor for Budget, Policy, and Programs to the Secretary of Housing and Urban Development (HUD) from January 2021-December 2022. In this role, I served as the Secretary's primary liaison with the Office of Management and Budget (OMB) and coordinated budget formulation and execution between the Secretary's office and the Office of the Chief Financial Officer.

4.      From January 2023—May 2023, I served as Associate Director for Housing, Treasury, Commerce at OMB. From May 2023-January 2025, I served as the Associate Director for General Government Programs at OMB. In these roles, I managed the budget execution of the Departments of Housing and Urban Development, Treasury, Commerce, Transportation, Homeland Security and Justice as well as the Small Business Administration, General Services Administration, Executive Office of the President and more than 30 small and independent agencies.

5.      Throughout my career in Federal service, I have interacted with apportionments, which (as defined by OMB Circular A-11, Section 120.1[1]) are OMB-approved plans to use budgetary resources. More specifically, apportionments are OMB-approved plans for making congressionally appropriated funds available for agency spending. On the Appropriations Committee, I had a vested interest in ensuring that appropriated funds were being used for their statutory purposes. Before the publicly available apportionment website (which I discuss in paragraph 8 below), this would require inquiring with the relevant agency budget offices to ask if the funds had been apportioned and allotted and were available for obligation. In my role at HUD, I worked with the Office of the Chief Financial Officer to ensure that funds were apportioned after each enacted appropriations Act, so that the Department could allot funds internally and begin

---

[1] https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

obligating and expending appropriated funds. At OMB, I supervised two deputy associate directors who had been delegated the OMB Director's authority to approve apportionments. During my tenure at OMB, the approval of apportionments by the deputy associate directors was largely ministerial in nature and aimed at faithfully and responsibly executing the aims of the appropriation.

6. Apportionment of funding represents a crucial step in the budget execution process. It starts the process through which the executive branch obligates and expends funds, and an approved apportionment is binding on the agency and has the force of law. Without an approved apportionment, the executive branch generally cannot obligate or expend an appropriation. In fact, obligating or expending funds without an approved apportionment violates the Antideficiency Act. (OMB Circular A-11, Section 120.8.)

7. OMB Circular A-11, Section 120 specified the process under which an agency requested and OMB approved an apportionment during my tenure at OMB. In general, an agency requests an apportionment through OMB's apportionment system, OMB staff reviews the request and confers with the agency with questions about the request, OMB staff drafts an apportionment for the OMB approver, typically a deputy associate director, and then, after consultation with staff, the approver approves the apportionment and the agency is notified of the approval. An apportionment addresses all budgetary resources in an account—including annual discretionary appropriations, mandatory funding, carryover funds from prior fiscal years, recaptures, and transfers. An apportionment often divides the budgetary resources available in a fiscal year into amounts available each fiscal quarter or other time division (Category A) and makes funds available for specific purposes and programs specified within the appropriation (Category B). For multi-year funding or for funding available until expended, an apportionment might reserve funds

for a future fiscal year (Category C). Additionally, an apportionment might include additional direction in a footnote that conditions the availability of funds on a certain agency action, like the submission of a spend plan. If budgetary conditions change throughout the year, the agency may submit a revised request to change the amounts and terms on the apportionment, which would then go through the same review and approval process outlined in this paragraph.

8.   Throughout my tenure at OMB, OMB maintained a publicly available website that provided digital copies of the information contained in apportionments for each Treasury Appropriation Fund Symbol (TAFS),[2] pursuant to 31 U.S.C. § 1513 note, formerly available at https://apportionment-public.max.gov/. The data posted on the publicly available apportionment website included only the final, OMB approved, legally binding amounts and the accompanying footnotes, which are part of the final, OMB-approved apportionment decisions.

9.   In my current capacity, I rely on the public apportionment website to obtain data about available funding and timelines for certain programs. The data provided on the website is not available from any other government source. I use the data to track the budget execution of funding that I have a personal interest in. I also use the data to help formulate strategic advice for colleagues and clients about the status of appropriations and budget execution. I estimate that, in the time since I left my position at OMB, I refer to the publicly available apportionment data weekly.

10.  For example, the Department of Housing and Urban Development Appropriations Act, 2020 included Section 231 (42 U.S.C. 11364a), which converts "recaptured"[3] funding from

---

[2] "TAFS" is a unique identifier for an appropriation in the Treasury and includes information on the agency responsible for the account and the period of availability.

[3] "Recaptured" funds are funds that were awarded to a grantee in a prior fiscal year and were unexpended at the end of the period of performance for the grant. The unexpended funds are returned to HUD.

the Department of Housing and Urban Development's (HUD) Homeless Assistance Grants program into no year funding[4] available for specified purposes. Subsection (a) lists the purposes, which include: subparagraph (1), allowing HUD to use funding for grants under the Continuum of Care program; subparagraph (2), allowing HUD to use funding for grants under the Emergency Solutions Grant program; subparagraph (3), requiring HUD to reserve not less than 10 percent for grants in rural areas; and subparagraph (4), requiring HUD to reserve not less than 10 percent of the recaptured funding for grants in disaster areas. The funds recaptured pursuant to this section are the only source of budgetary resources available for the grants to disaster areas in subparagraph (4).

11.    The information on the apportionment (TAFS: 086-0192/X) provides details on the amount of funding recaptured and how OMB has allocated the recaptured funds between the specified purposes. Because these funds are not appropriated annually, but instead are recaptured from unspent prior year funds, the apportionment provides the only source of publicly available information on the amount recaptured and the amount of recaptured funds available for each of the specified purposes.

12.    One of the specified purposes for which recaptured funds are available is HUD's Rapid Unsheltered Survivor Housing (RUSH) program, which provides grants to communities affected by natural disasters.[5] People experiencing homelessness or at risk of homelessness prior to a natural disaster often struggle to obtain assistance in the Federal Emergency Management Agency's Stafford Act programs. The RUSH program provides resources that do not exist

---

[4] "No year funding" means that the funds are available until expended. In contrast, funds appropriated annually into the Homeless Assistance Grant account have a limited period of availability, typically two fiscal years.

[5] This funding uses funds recaptured from Section 231 pursuant to subsection (a) subparagraph (4) of the section under the authorities granted in subsection (c).

elsewhere in the Federal government and is funded wholly from recaptures pursuant to Section 231. HUD published a notice of the terms and conditions for the funds in the Federal Register on July 18, 2024 (Docket No. FR-6315-N-01, "Allocation Formula, Applicable Requirements, and Waivers and Suspension of Requirements for Rapid Unsheltered Survivor Housing (RUSH)", 89 FR 58392). As HUD states in the notice: "RUSH is designed to provide immediate funding to States or local governments capable of acting quickly to meet the unmet homeless assistance and homeless prevention needs in declared disaster areas" and "Provided that data is available, HUD plans to notify States or local governments of their eligibility for a RUSH grant within 30 days of a major disaster." Given the quick timeline from a qualifying disaster to funding award, it is critical to know how much funding is available for the year from recaptures, how much was allocated to the RUSH program, how much has been awarded, how much funding has been obligated, and how much remains available for obligation.

13. SF-133 data (available at: https://portal.max.gov/portal/document/SF133/Budget/FY%202025%20-%20SF%20133%20Reports%20on%20Budget%20Execution%20and%20Budgetary%20Resources.html) provides information on obligations, by month, and HUD's press releases provide information on funding awards (https://www.hud.gov/news/hud-no-25-035). To the best of my knowledge, however, the only publicly available source of information for the total amount of unobligated funds available for RUSH for the year as well as any relevant footnotes or contingencies on the funding is from the apportionment. Because we cannot know when or where a disaster might strike, it is important that all potential grantees, and the public, know what funding is potentially available to assist people experiencing homelessness after a natural disaster and what conditions must be satisfied before funding could be available.

14. While the RUSH example provides useful insight, it is far from comprehensive. Without timely access to the publicly available data that was on OMB's public apportionment website, determining the total budgetary resources for a specific appropriation at any given moment—and understanding the terms and conditions governing those funds before an agency may obligate them—becomes nearly impossible. The statutory requirement that each apportionment be posted as an open government data asset allowed for other websites like OpenOMB.org to use that data and display it in more user-friendly ways. Taking a step back, the removal of this data from public view undermines transparency in how taxpayer dollars are allocated and spent. Other phases of budget execution offer robust, publicly accessible data, such as the SF-133 reports and spending.gov. However, the budget execution process in the executive branch begins with an OMB-approved apportionment, making it essential that the American people have visibility into how the process starts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2025

_____
Joseph Carlile