UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, <br><br> Plaintiff, <br><br> v. <br><br> OFFICE OF MANAGEMENT AND BUDGET, et al., <br><br> Defendants. | Civil Action No. 25-cv-1051 |

**DECLARATION OF KENNETH SCHWARTZ**

I, Kenneth Schwartz, declare as follows:

1. I was an Office of Management Budget (OMB) employee from 1969 to 2005 (with three years absence). In total, I served at OMB for over 30 years. In my early years, I was a budget examiner. Later on, I was a branch chief and then, finally, a Deputy Associate Director (DAD). As a DAD, I served over 18 years. DADs are among the senior-most career officials at OMB.

2. During my tenure at OMB, there were eight programmatic DADs. Each DAD was assigned responsibility for the budgets of a set of agencies. My set included three cabinet agencies – the Departments of Justice, Homeland Security, and Transportation – as well as several non-cabinet agencies, the most significant of which was the General Services Administration. My primary task, through staff reporting to me, was to prepare the President's budget requests for the agencies specified above prior to the submissions of those requests to Congress. DADs and their staffs were expected to be experts in the programs for which they had oversight responsibility. I had about 30 professionals working for me.

3. Another responsibility that I had as a DAD was budget execution (as distinct from budgetary preparation). Part of that responsibility was processing apportionment requests from the agencies. Apportionments release funds appropriated by Congress. Apportionment requests are prepared by the agencies for each and every budget account. Most agencies have multiple budget accounts. For example, one account may provide for the salaries and expenses associated with an agency's staff – e.g., staff of the Federal Highway Administration. Another account may provide funds for a grant program that the agency supports – e.g., Federal-aid highways (a grant program to states).

4. As a DAD, I signed and approved, on behalf of OMB, hundreds, if not thousands, of apportionments. If an agency "overspent" the amount provided in the approved apportionment, it constituted a violation of the Anti-Deficiency Act, and the violation would be reported to the President for consideration of remedial actions.

General Background on Apportionments Process

5. Every year, each agency would transmit to OMB its apportionment requests. The agency requests would show the funds available – that is, funds appropriated by Congress – on the top, and the suggested release of the funds on the bottom. The suggested release could either be by quarter – usually about 25% for each of the four quarters for accounts that were largely comprised of funds for Federal staffing (personnel accounts) – or by some other metric for non-personnel accounts, such as grant accounts. For example, if the account were for "Federal aid to highways," the proposed agency apportionment might show funding releases according to when the Federal Highway Administration actually distributes its funds to the States during the course of a year. Or perhaps they might show it by sub-category, such as Interstate construction and bridges.

6. My staff would review the incoming agency apportionment requests, and they would advise me of their recommendations. Almost invariably, they would recommend approval of the agency's request without change. I had to be careful to avoid "tinkering" with apportionment requests in a way that might be construed as improper, or unlawful, *de facto* deferrals or rescissions. As a general rule, we viewed apportionments as the simple release of funds duly appropriated by Congress. A typical example of a change to the request might be as follows: If the agency asked that 100% of available funds be released in the first quarter for a personnel account, my staff might view that as unreasonable on its face. Rather, common sense would suggest that it was more reasonable to assume that about 25% of available funding should be made available in each quarter to avoid the possibility of agency overspending in the early months of the year. In general, though, I would estimate that over 98% of apportionments were reasonable and approved as requested. My understanding is that upon the return of a signed apportionment to an agency, the agency would provide the apportionment to the Treasury Department for release of the funds.

7. After apportionments are approved by OMB, they are binding on agencies. In my view and based on my experience, they are neither pre-decisional nor deliberative. Rather, they simply reflect the results of the Congressional appropriations process. It was often the case that there were multiple apportionments for an account over the course of a year. For example, the first apportionment under a Continuing Resolution would include only the funds made available from the first Continuing Resolution (plus carryover balances from the prior year). Subsequent re-apportionments would provide additional funding simply because added funding was available for added months, leading eventually to an apportionment for the entire year. But those are re-apportionments solely for the purpose of releasing the funds made available by appropriations laws. Apportionment and re-apportionments were neither predecisional nor deliberative.

8.  In my experience, I do not recall a single case of a classified apportionment, or where an apportionment revealed classified information, even in the cases of the Department of Homeland Security and the Department of Justice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2025.

_____
Kenneth Schwartz