# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY | ) | |
| AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-01051-EGS |
| | ) | |
| OFFICE OF MANAGEMENT AND | ) | |
| BUDGET, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND FOR A PARTIAL MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INDEX OF EXHIBITS ...................................................................................................... viii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

   I.    Statutory Background ............................................................................................... 2

       A.  The Consolidated Appropriations Acts of 2022 and 2023 ............................ 2

       B.  The Paperwork Reduction Act ...................................................................... 3

   II.   Factual Background ................................................................................................. 4

       A.  The Apportionment Process ........................................................................... 4

       B.  The Apportionment Documents and their Contents. ..................................... 6

       C.  The Apportionment Reporting Requirements ................................................ 7

   III.  Procedural History .................................................................................................. 7

LEGAL STANDARD ........................................................................................................... 8

       A.  Preliminary Injunction Standard ................................................................... 8

       B.  Summary Judgment Standard ......................................................................... 9

ARGUMENT ...................................................................................................................... 10

   I.    CREW Cannot Establish Likelihood of Success on the Merits. ........................... 10

       A.  CREW Lacks Standing Under Article III. .................................................. 10

       B.  CREW's Claim That Defendants' Conduct Violated the 2022 and 2023 Acts is Unlikely to Succeed Because the Statute Unconstitutionally Infringes Upon Executive Power. ....................................................................................................... 15

       C.  CREW Cannot Establish Likelihood Of Success On Its PRA Claims. ...... 22

   II.   CREW Has Failed to Demonstrate that It Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief ............................................................................................ 23

   III.  The Balance of the Equities and the Public Interest Support Rejection of CREW's Motion ............................................................................................................................ 26

   IV.  CREW Should Be Ordered to Post Security in Connection with Any Preliminary .......... 26 Injunctive Relief ............................................................................................................. 26

   V.   CREW's Partial Motion for Summary Judgment Fails ......................................... 27

CONCLUSION ................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ........................................................................... 9

*Advoc. Christ Med. Ctr. v. Becerra*,
No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022) ............................... 9

*Alcresta Therapeutics, Inc. v. Azar*,
318 F. Supp. 3d 321 (D.D.C. 2018) .................................................................. 24

*Army Times Publ'g Co. v. Department of the Air Force*,
998 F.2d 1067 (D.C. Cir. 1993) ........................................................................ 19

*Bagherian v. Pompeo*,
442 F. Supp. 3d 87 (D.D.C. 2020) .................................................................... 21

*Bowsher v. Synar*,
478 U.S. 714 (1986) ........................................................................... 16, 17, 20

*Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*,
498 F. Supp. 3d 87 (D.D.C. 2020) .................................................................... 26

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) .................................................................. 24

*Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*,
No. 25-CV-511 (CRC), 2025 WL 752367 (D.D.C. Mar. 10, 2025) ................... 25

*Clinton v. Jones*,
520 U.S. 681 (1997) .......................................................................................... 16

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980) .......................................................................... 18

*Dellinger v. Bessent*,
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................................. 9

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .............................................................................................. 18

*Doctors for America v. OPM*,
-- F. Supp. 3d --, 2025 WL 452707 (D.D.C. Feb. 11, 2025) ....................................... 11

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................ 10, 13, 14

*Ex parte Levitt*,
302 U.S. 633 (1937) .................................................................................................... 11

*FEC v. Akins*,
524 U.S. 11 (1998) ...................................................................................................... 14

*Feng Wang v. Pompeo*,
354 F. Supp. 3d 13 (D.D.C. 2018) ................................................................................ 9

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .................................................................................................... 10

*Hi-Tech Pharmacal Co. v. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................ 23

*Immigration & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) .................................................................................................... 16

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .............................................................................. 18, 19

*Judicial Watch, Inc. v. United States Dep't of Justice*,
20 F.4th 49 (D.C. Cir. 2021) ...................................................................................... 18

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 23, 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................................. 10, 11

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ...................................................................................................... 8

*Mistretta v. United States*,
488 U.S. 361 (1989) .................................................................................................... 16

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................ 9

*NAACP v. U.S. Department of Educ.*,
No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025) ........................... 26

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
861 F.2d 1114 (9th Cir. 1988) .................................................................. 19

*Navajo Nation v. Azar*,
292 F. Supp. 3d 508 (D.D.C. 2018) ............................................................ 23

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ............................................................................ 17

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................... 8, 26

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ............................................................................ 19

*Open Tech. Fund v. Pack*,
470 F. Supp. 3d 8 (D.D.C. 2020) .............................................................. 26

*Prisology, Inc. v. Federal Bureau of Prisons*,
852 F.3d 1114 (D.C. Cir. 2017) ............................................................... 13

*Public Citizen v. DOJ*,
491 U.S. 440 (1989) ............................................................................ 13

*Research & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ................................................................. 22

*Sackett v. E.P.A.*,
566 U.S. 120 (2012) ....................................................................... 19, 20

*State v. Musk.*,
---F. Supp. 3d ---, 2025 WL 520583 (D.D.C. 2025) ......................................... 24

*Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*,
762 F. Supp. 2d 8 (D.D.C. 2011) .............................................................. 8

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
560 F. Supp. 3d 81 (D.D.C. 2021) ............................................................................ 9

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs,*
60 F.3d 867 (1st Cir. 1995) .................................................................................... 19

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................................................... 11, 15

*Trump v. United States,*
603 U.S. 593 (2024) ................................................................................................ 16

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.,*
592 U.S. 261 (2021) ................................................................................................ 19

*United States v. American Tel. & Tel. Co.,*
567 F.2d 121 (D.C. Cir. 1977) ............................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ...................................................................................................... 8

*Wis. Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) ............................................................................... 23

**STATUTES**

31 U.S.C. § 1512 ............................................................................................. 4, 17, 20

31 U.S.C. § 1513 ............................................................................................... 3, 4, 16

44 U.S.C. § 3501 ................................................................................................. 3, 15

44 U.S.C. § 3504 ....................................................................................................... 4

44 U.S.C. § 3506 ................................................................................................. 4, 22

5 U.S.C. § 552 ................................................................................................... 13, 21

Pub. L. 117–103, div. E, title II, § 204(a), 136 Stat. 257 (Mar. 15, 2022) ................... 2

Pub. L. 117–328, div. E, title II, § 204, 136 Stat. 4667 (Dec. 29, 2022) ...................... 3

**OTHER AUTHORITIES**

1 Op. O.L.C. 16 (1977) ........................................................................................... 22

28 Op. O.L.C. 79, 81 (2004) ................................................................................... 22

6 Op. O.L.C. 632 (1982) ......................................................................................... 22

Federalist No. 72 (A. Hamilton) (Clinton Rossiter ed. 1961) ................................. 17

Financial Services and General Government Appropriations for 2023: Hearings Before the

Subcomm. on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt.

5 (2022) ................................................................................................................... 14

OMB Circular No. A-11 .......................................................................................... 19

The Federalist No. 70 (A. Hamilton) (Clinton Rossiter ed. 1961) ........................... 17

U.S. Const. art. III, § 2, cl. 1 ................................................................................... 10

## <u>INDEX OF EXHIBITS</u>

1. Declaration of Kelly Kinneen

2. Defendants' Counter-Statement of Material Facts as to Which There is No Genuine Issue

3. Proposed Order

## INTRODUCTION

In this case, Plaintiff Citizens for Responsibility and Ethics in Washington's ("CREW"), a non-profit, government watchdog organization, attempts to enforce a statute that purports to require the Office of Management and Budget ("OMB") to publicly post documents apportioning appropriated funds. CREW seeks a preliminary injunction, and has moved for partial summary judgment, arguing that OMB's decision to discontinue apportionment postings is contrary to law. The Court should deny both motions.

As a threshold matter, CREW lacks standing to bring this case. Article III does not permit litigation premised on generalized grievances that are common to all members of the public and where the plaintiff has not suffered a particularized injury, as is the case here. Nor has CREW suffered the type of harm Congress sought to prevent by requiring disclosure of apportionment documents. Disclosure was aimed at providing the public with insights into government spending and enabling Congress to oversee the Executive Branch's apportionment of appropriated funds, not to enable an organization's mission as a watchdog.

 CREW's claim also fails on the merits. The President has delegated to OMB authority to allocate budgetary resources consistent with policy goals. OMB initiates the budget allocation process through its apportionment of appropriated funds. Apportionments are inherently deliberative in nature: they are OMB's interim funding deliberations, are routinely subject to change based on evolving conditions, and merely reflect OMB's best judgment in the moment about how an agency should use its funds. The statutes at issue—which would require OMB's disclosure of deliberative information— violate the separation of powers and Article II, and thus are unconstitutional and unenforceable.

CREW has also failed to show that it is suffering, or will suffer, irreparable harm in the absence of preliminary relief.  Indeed, CREW has failed to show that it needs access to the apportionment documents on a preliminary basis and that information regarding the Executive Branch's spending is not otherwise available.  The balance of equities and the public interest also cut against CREW's request.  The Court should deny CREW's request for a preliminary injunction and partial summary judgment.

## **BACKGROUND**

### I.    **Statutory Background**

CREW claims that Defendants have violated three statutes—the Consolidated Appropriations Act of 2022, the Consolidated Appropriations Act of 2023, and the Paperwork Reduction Act.

### A.  **The Consolidated Appropriations Acts of 2022 and 2023**

The Consolidated Appropriations Act of 2022 ("2022 Act") states that the Office of Management and Budget ("OMB") is to "provide to the Committees on Appropriations and the Budget of the House of Representatives and the Senate each document apportioning an appropriation . . . including any associated footnotes, not later than 2 business days after the date of approval of such apportionment by the Office of Management and Budget."  Pub. L. 117–103, div. E, title II, § 204(a), 136 Stat. 257 (Mar. 15, 2022).  The 2022 Act further provides that OMB is to implement "an automated system to post each document apportioning an appropriation . . . , including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset . . . not later than 2 business days after the date of approval of such apportionment, and shall place on such website each document apportioning an appropriation . . . , including any associated footnotes, already approved the current fiscal year . .

. . ." *Id*. § 204(b).  The statute also states that "[e]ach document apportioning an appropriation . . .
that is posted on a publicly accessible website . . . shall also include a written explanation by the
official approving each such apportionment stating the rationale for any footnotes for
apportioned amounts."  *Id*. § 204(c).  Finally, the statute provides that OMB or the applicable
agency "shall make available classified documentation referenced in any apportionment at the
request of the chair or ranking member of any appropriate congressional committee or
subcommittee."  *Id*.

The Consolidated Appropriations Act of 2023 ("2023 Act") provides that OMB "shall
continue to post [to its website] each document apportioning an appropriation . . . including any
associated footnotes."  Pub. L. 117–328, div. E, title II, § 204, 136 Stat. 4667 (Dec. 29, 2022)
(codified at 31 U.S.C. § 1513 note).

### B.  The Paperwork Reduction Act

The Paperwork Reduction Act ("PRA") was enacted in 1995.  44 U.S.C. § 3501.  Its
purposes include to "ensure the greatest possible public benefit from and maximize the utility of
information created, collected, maintained, used, shared and disseminated by or for the Federal
Government," "minimize the cost to the Federal Government of the creation, collection,
maintenance, use, dissemination, and disposition of information," and "provide for the
dissemination of public information on a timely basis, on equitable terms, and in a manner that
promotes the utility of the information to the public and makes effective use of information
technology."  *Id*. at § 3501(2), (5), (7).

The PRA provides that "consistent with applicable law," the OMB Director is to "oversee
the use of information resources to improve the efficiency and effectiveness of governmental
operations to serve agency missions, including burden reduction and service delivery to the

public." *Id* § 3504(a)(1)–(2).  Specifically, the PRA states that agencies shall "ensure that the

public has timely and equitable access to the agency's public information."  *Id*. § 3506(d).

## II.    Factual Background

### A.  The Apportionment Process

At the start of each fiscal year, after appropriations bills are passed, the President must

"apportion" the budget authority to the relevant federal agencies before each agency may

obligate its funds.  31 U.S.C. §§ 1512–13; Declaration of Kelly Kinneen ("Kinneen Decl.") ¶ 4.

The President has delegated this apportionment authority to the OMB Director.  E.O. 6166, as

amended by E.O. 12,608; Kinneen Decl. ¶ 4.

An apportionment is an OMB-approved plan to use budgetary resources.  31 U.S.C. §

1513(b)); Kinneen Decl. ¶ 5.  OMB apportions funds to agencies by time period, specific activity

or project, or both.  31 U.S.C. § 1513(b)(1); Kinneen Decl. ¶ 5.  Funds are apportioned "as the

[apportioning] official considers appropriate."  31 U.S.C. § 1512(b)(2); Kinneen Decl. ¶ 6.

Apportionments involve "significant discretion and judgment regarding the budgetary resources

a program requires, including when those resources will be needed and for what purpose."

Kinneen Decl. ¶ 6.  Apportionments are legally binding on agencies, but not on OMB which

remains free to alter its apportionment decisions "whenever it so chooses."  Kinneen Decl. ¶ 6.

OMB Circular No. A-11 "confirms that agencies must follow instructions from the President,

acting through OMB."  Kinneen Decl. ¶ 6.

Apportionments reflect OMB's forward-looking judgment about how an agency should

use its funds during the period when those funds are legally available for obligation.  *Id*. ¶ 10.

Apportionments "are estimates of the amounts of budgetary resources that OMB anticipates that

programs will likely require in the future."  *Id*. ¶ 16.  OMB is statutorily required to periodically

review and potentially modify apportionment decisions based on changes in circumstances or policy goals. 31 U.S.C. 1512(a); Kinneen Decl. ¶ 10. As such, apportionments are "an internal Executive branch fiscal control mechanism designed to ensure that funds are being spent in accordance with the law and policy." Kinneen Decl. ¶ 16. They involve "ongoing conversations and instructions to the agencies to ensure that apportionments are updated to reflect current realities and future estimates." *Id*. ¶ 16. "Apportionments are an interim step in the spending cycle that is only finalized "when the agency, not OMB, takes actions to obligate or expend the funds." *Id*.

OMB's apportionment judgment can, and frequently does, change based on changes in economic, foreign policy, or domestic policy changes and events. As long as the agency has not expended the funds for a program, OMB can reapportion the funds for other purposes, within the scope of the appropriation, throughout the fiscal year. *Id*. ¶ 12. Apportionments are part of an iterative, internal Executive Branch decision-making process that involves ongoing discussions between OMB and agencies to ensure that apportionments reflect current realities and future estimates. *Id*. ¶ 12, 15. Following the issuance of an apportionment, "OMB continues to monitor agency funding, and works with agencies to determine the best use of appropriated funds. It may advise agencies regarding the President's priorities for the use of the funds or on sensitive matters touching on national security or foreign policy." *Id*. ¶ 16.

Two steps generally follow an OMB apportionment—obligation and expenditure. An OMB apportionment is typically required before an agency obligates funds, that is before an agency enters into a legally binding commitment that requires payment for goods or services. *Id*. ¶ 7. An expenditure occurs when an agency makes a payment on an obligation. *Id*. ¶ 8. Although obligations and expenditures cannot exceed the amount apportioned by OMB, an

agency is not required to obligate or expend the full amount apportioned.  *Id.* ¶ 9.

    **B.  The Apportionment Documents and their Contents.**

OMB communicates apportionment decisions to agencies through Excel sheets that include designated funds for times, periods, projects, or activities.  *Id.* ¶ 10.  Designated funds are often accompanied by footnotes that give an agency additional information or instructions beyond the dollar amounts.  *Id.* ¶ 11.  Footnotes often provide additional restrictions on the use of funds, or condition the availability of funds on further action by the agency, or on other future circumstances.  *Id.*  Footnotes may disclose ongoing negotiations between an agency and OMB. *Id.*  Footnotes may also reflect OMB's current policy deliberations, assumptions about program needs, and even future economic assumptions, all of which are subject to change and may precipitate re-apportionment.  *Id.*

For example, a recently published apportionment to the Department of Interior included a footnote that conditioned fund allocation on the agency's provision of a spend plan that aligned with OMB's spending goals.  Kinneen Decl., Exhibit B.  An apportionment to the Department of Homeland Security required the agency to submit written reports justifying its programmatic spending decisions.  *Id.*  These documents "demonstrate the iterative nature of OMB's apportionment decisions because additional engagement was necessary with the agencies before the funding could be provided for the purposes in question."  Kinnen Decl. ¶ 17

In sum, apportionment documents "contain deliberative information that, while not classified, could nevertheless reveal sensitive information about national security, foreign affairs, the industrial base, critical infrastructure, and the like."  *Id.* ¶ 17.  An apportionment may also "indicate predecisional details regarding the timing for an infrastructure project, or may indicate the recipient of foreign aid."  *Id.*  Since the 2022 Act's enactment, OMB has been forced to omit

6

"key information that would assist OMB and agencies in guiding allocations of resources throughout the funding process." *Id.* ¶ 13.

### C. The Apportionment Reporting Requirements

From July 2022 through March 24, 2025, OMB operated a publicly available apportionment reporting system in accordance with the 2022 Act. *See id.* ¶ 13. On March 29, 2025, OMB explained, in correspondence to members of Congress, that it would no longer operate and maintain the publicly available automated system to which apportionments are posted. Kinneen Decl., Exhibit C. OMB determined that the system improperly requires "disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change." *Id.* OMB further explained that such disclosures have a "chilling effect on deliberations within the Executive Branch," and have "adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending." *Id.*

## III.    Procedural History

On April 8, 2025, CREW filed its complaint under the Administrative Procedure Act ("APA") against OMB and its director, in his official capacity, alleging that OMB unlawfully removed its automated system for posting apportionment documents to a publicly accessible website, and the information in that system. ECF No. 1. The Complaint asserts two counts. Count I alleges that failing to maintain a publicly available apportionment database violates the requirements of the 2022 and 2023 Acts, lacks reasoned decisionmaking, and is arbitrary and capricious. *Id.* at 8–9. Count II alleges that removing the database was procedurally improper,

because OMB failed to provide advance public notice before removing the database, in violation of the PRA. *Id*. at 9–10. The Complaint seeks declaratory and injunctive, including restoration of the database and an injunction preventing Defendants from removing it again. *Id*. at 10.

On April 18, 2025, CREW filed a Motion for a Preliminary Injunction and Partial Summary Judgment, seeking the same relief as its Complaint seeks. ECF No. 9.

## LEGAL STANDARD

### A. Preliminary Injunction Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Any movant seeking a preliminary injunction, must demonstrate that they will suffer irreparable harm in the absence of the requested relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Irrespective of a party's showing as to the other three factors necessary to obtain preliminary equitable relief, "'[a] . . . failure to show any irreparable harm' constitutes grounds for denying the motion." *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Moreover, relief that "deeply intrudes into the core concerns

of the executive branch" may be awarded only upon "an extraordinarily strong showing" as to each element. *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (quoting *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978)).

The particular form of injunction Plaintiff seeks here—an affirmative injunction ordering the Government to change the status quo—comprises a highly disfavored form of relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## B. Summary Judgment Standard

In an APA case, the Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply. Rather, the district court sits as an appellate tribunal, reviewing the administrative record. "[S]ummary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." See *Advoc. Christ Med. Ctr. v. Becerra*, No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022), *aff'd*, 80 F.4th 346 (D.C. Cir. 2023) (internal quotation omitted).

## ARGUMENT

**I.    CREW Cannot Establish Likelihood of Success on the Merits.**

**A.  CREW Lacks Standing Under Article III.**

Article III extends only to cases and controversies.  U.S. Const. art. III, § 2, cl. 1; *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024); *Coalition for Mercury Free Drugs v. Sebelius*, 671 F.3d 1275, 1278-79 (D.C. Cir. 2012).  The party seeking to invoke a federal court's jurisdiction bears the burden of establishing that it has standing to sue.  *Alliance*, 602 U.S. 367 at 378.  To establish standing, a plaintiff must show that: (i) it has or likely will suffer an injury in fact, (ii) defendant has or likely will cause plaintiff's injury, and (iii) the requested judicial relief will likely redress plaintiff's injury.  *Alliance*, 602 U.S. at 380.  A plaintiff's failure to meet just one of the three prongs results in its failure to establish standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that each standing element "must be supported").  In the preliminary injunction context, a plaintiff must show a "substantial likelihood of standing."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), 878 F.3d 371, 377 (D.C. Cir. 2017) (citing *Lujan*, 504 U.S. at 561).  "Standing is not dispensed in gross," but rather must be established for each claim in a complaint.  *Id*.

Despite it being CREW's burden to establish its standing, neither its complaint nor its motion even mentions standing.  CREW claims to be a "non-partisan, non-profit government watchdog organization," ECF No. 9-3 ¶ 4, and it argues, for purposes of irreparable harm, that it is suffering informational injury from Defendants' removal of public access to the apportionments database and the information within it, Mot. at 19.  CREW does not allege any harm to any members that it may have, so CREW's standing as an organization can only be

based on organizational standing, as opposed to associational standing, which requires that at least one of an organization's members have standing.  *See, e.g., Doctors for America v. OPM*, -- F. Supp. 3d --, 2025 WL 452707, at *3 (D.D.C. Feb. 11, 2025).

CREW has not established injury in fact for purposes of standing.  A plaintiff must show "that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public.'"  *United States v. Richardson*, 418 U.S. 166, 177–78 (1974) (quoting *Ex parte Levitt*, 302 U.S. 633, 636 (1937)).  In *Richardson*, the plaintiff claimed that "without detailed information on [agency] expenditures—and hence its activities—he [could not] follow the actions of Congress or the Executive" or "properly fulfill his obligations as a member of the electorate in voting for candidates seeking national office." *Id*. at 176.  Even fifty years ago, the Supreme Court recognized that "[a]s our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than at any period of our national development." *Id*.  The Supreme Court, however, concluded that the plaintiff's "generalized grievance" was insufficient to establish standing because plaintiff did not have a "personal stake in the outcome," a "particular, concrete injury," or "a direct injury." *Id*. at 176, 179–80; *Lujan*, 504 U.S. at 576 (concluding "the public interest in proper administration of the laws (specifically, in agencies' observance of a particular, statutorily prescribed procedure) can[not] be converted into an individual right by a statute that denominates it as such"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (In order to establish a concrete, information injury, the plaintiff must show "'downstream consequences' from failing to receive the required information.").

11

CREW's theory as to how it is injured as an organization by the removal of the apportionment database is that it uses the database to monitor federal government spending, which it claims is an important part of its work. More specifically, CREW claims that it uses the database to monitor the Executive Branch's use of appropriated funds and whether OMB is using the apportionment process to improperly withhold appropriated funds. CREW provides few details about its purported injury—and nowhere near enough to justify the drastic remedy of a mandatory injunction. It sent a letter to Congress warning about mischief to the apportionment process following the issuance of certain Executive Orders on January 20, 2025, and put this letter on its website, but that did not involve using any apportionment documents. ECF 9-3 ¶¶ 12–13. CREW also says it published on its website materials on the Impoundment Control Act, "including an analysis related to the Act's procedures for reducing government spending and a resource on the ICA's 'Key Concepts,' which explains OMB's role in apportioning funds and outlines the requirement that OMB publicly post each document apportioning an appropriation." *Id*. ¶ 16. Again, that description does not show that CREW used the apportionment documents in the database in that endeavor. While CREW did cite information from the database in FOIA requests that it made to OMB and the U.S. DOGE Service, those FOIA requests asked OMB for all records regarding requests for apportionments for the U.S. DOGE Service, demonstrating an alternative source for obtaining the documents. *Id*. ¶ 19 & n.20.

In support of its argument that it has suffered, and is suffering, an informational injury, CREW relies on *Doctors for America* and several FOIA cases involving preliminary injunction motions. Mot. at 18–21. Those cases do not help CREW establish its standing. *Doctors for America* found standing based on associational standing, based on particular members' claimed injury from being denied access to certain information. Those members were doctors who

regularly relied on the withdrawn information, had limited alternatives for replacing the information, and had to expend scarce, valuable resources to do so.  As noted above, CREW does not seek to establish injury based on associational standing relying on any harm to any members, nor does CREW's allegations about its reliance on documents in the apportionments database or effect of their nonavailability rise to the level of the doctors in *Doctors for America*.

In FOIA cases, including ones brought to enforce FOIA's affirmative disclosure obligations under 5 U.S.C. § 552(a)(2), anyone who has requested specific records from an agency and had their request denied has standing to bring an action; "the requester has suffered a particularized injury because he has requested and been denied information Congress gave him a right to receive." *Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017).  The same is true when someone requests, and is denied, information under the Federal Advisory Committee Act. *Public Citizen v. DOJ*, 491 U.S. 440, 449–50 (1989).  In contrast here, there are no allegations of a request for, and denial of, apportionment documents to support a particularized injury for purposes of standing.  *See* ECF No. 1.

Nor does CREW's asserted information injury satisfy the test set forth by the D.C. Circuit in *EPIC* for a denial of access to information to constitute an injury-in-fact for standing purposes. In *EPIC*, the plaintiff was a nonprofit organization whose mission was to focus public attention on emerging privacy and civil liberties issues.  878 F.3d at 374.  It sued a presidential commission on election integrity, which had requested voter roll data from the states, for failing to complete a privacy impact assessment before collecting that information, as allegedly required by the E-Government Act.  *Id*.  The court held that EPIC lacked standing based on either informational or organizational injury.  *Id*. at 378.  The court explained that to demonstrate a "'sufficiently concrete and particularized informational injury'" for purposes of standing, a

plaintiff must show that "'(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Id.* (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also FEC v. Akins*, 524 U.S. 11, 22 (1998) (noting the presence of a statute that "does seek to protect individuals such as respondents from the kind of harm they say they have suffered, i.e., failing to receive particular information about campaign-related activities."). The court held that EPIC had not suffered the type of harm that the E-Government Act sought to prevent in requiring agencies to conduct privacy impact assessments, and therefore faltered at the second step. *EPIC*, 878 F.3d at 378. That requirement was meant to protect individuals' privacy—in the context of EPIC's challenge, voters' privacy—not help EPIC further its mission of "ensuring public oversight of record systems" or focusing public attention on privacy issues. *Id.*

CREW fails at both steps. Neither the 2022 or 2023 Acts, nor the PRA, require disclosure of information to CREW, but rather require the government's disclosure of information to the public at large. CREW also has not suffered the type of harm Congress sought to prevent by requiring disclosure under the 2022 and 2023 Acts and the PRA. The 2022 and 2023 Acts are intended to provide the public with insights into government spending and to enable Congress to oversee the Executive Branch's apportionment of appropriated funds. *See* Financial Services and General Government Appropriations for 2023: Hearings Before the Subcomm. on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt. 5, at 125 (2022) (The 2023 Act "will provide the public with insight into billions of dollars of federal spending, while ensuring this committee, and Congress, can perform its oversight work and ensure the executive branch is faithfully implementing appropriations law."). The injury

CREW seeks to vindicate is its ability to use the apportionment database to act as a government watchdog.  In other words, CREW asserts an interest in using the database to play a watchdog function, as part of its business plan, albeit its nonprofit business plan.  For example, it uses the database to submit FOIA requests.  ECF No. 9-3 ¶ 19 & n.20.  That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight.

Similarly, the PRA was enacted to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7); *see* Mot. at 16 (quoting same).  As with the 2022 and 2023 Acts, the alleged harm to CREW's business model is not the type of harm Congress sought to prevent when enacting the PRA.  Moreover, Plaintiff has not demonstrated any concrete harm stemming from Defendants' alleged non-compliance with the PRA's notice requirements.  *See TransUnion*, 594 U.S. at 440 ("Without any evidence of harm caused by the format of the mailings, these are bare procedural violations, divorced from any concrete harm." (cleaned up)).  The bare allegation that "Defendants provided no notice at all," Mot. at 18, is insufficient under Article III.

**B. CREW's Claim That Defendants' Conduct Violated the 2022 and 2023 Acts is Unlikely to Succeed Because the Statute Unconstitutionally Infringes Upon Executive Power.**

CREW is unlikely to succeed on its claim that OMB's failure to operate and maintain a system to publicly post apportionments is unlawful.  Under the 2022 and 2023 Acts, Congress

imposed various requirements relating to OMB's apportionment approvals, including that OMB maintain a publicly available, automated system wherein approved apportionments are posted within two business days of the date of approval and written explanations for any footnotes accompanying approved apportionments are provided. *See* 31 U.S.C. § 1513 note. Because these provisions constitute impermissible Congressional intrusion into Executive functions, CREW's enforcement attempt fails.

The Constitution divides power "into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983). Each Branch is required to act "within its assigned sphere" consistent with Constitutional mandates. *Id*. at 952–53. Although the three Branches are not "entirely separate and distinct," each Branch must be "free from the control or coercive influence, direct or indirect, of either of the others." *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (cleaned up). "Even when a branch does not arrogate power to itself[,] the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (cleaned up); *see also Trump v. United States*, 603 U.S. 593, 614 (2024).

Indeed, "[t]he Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). Once Congress enacts legislation, "its participation ends" and "can thereafter control the execution of its enactment only indirectly—by passing new legislation." *Id*. at 733–34 (citation omitted); *Chadha,* 462 U.S. at 958 (holding that a legislative veto violated separation of powers because it permitted Congressional override of a function delegated to the

Executive Branch).  The Constitution, therefore, prohibits Congressional intrusion into the President's "supervisory and policy responsibilities," which include[s] the enforcement of federal law." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

More specifically, the "application and disbursement of the public moneys in conformity to the general appropriations of the legislature" is executive in nature, and those carrying out such functions "ought to be considered as the assistants or deputies of the chief magistrate." The Federalist No. 72, at 435–36 (A. Hamilton) (Clinton Rossiter ed. 1961).  Apportionment allows the President to act with "energy" and "unity" in the implementation of programs enacted by Congress. The Federalist No. 70, at 472 (A. Hamilton) (Clinton Rossiter ed. 1961).  And "the Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Bowsher*, 478 U.S. at 722.  Accordingly, Congress's power of appropriation has long been understood to not carry with it a power to infringe upon the constitutional prerogatives of other entities.  Thus, once Congress appropriates funds, the power of administering the funds falls on the President.

Here, Congress afforded the President authority to apportion funds as he "considers appropriate." *See* 15 U.S.C. § 1512(b)(2).  And as the statutory scheme recognizes, the Executive Branch's apportionment decisions are subject to change.  *See* 31 U.S.C. § 1512(a) ("An apportionment may be reapportioned under this section."); *id*. § 1512(d) ("An apportionment or a reapportionment shall be reviewed at least 4 times a year by the official designated in section 1513 of this title to make apportionments.").  In practice, OMB and agencies engage in an iterative process before appropriated funds are obligated and expended.  Kinneen Decl. ¶ 16. Following issuance of an apportionment, "OMB continues to monitor agency funding, and works with agencies to determine the best use of appropriated funds."  *Id*.  Apportionment are not fixed;

17

OMB frequently re-visits and amends apportionment decisions based on changing circumstances, including ongoing discussions with agencies. *Id.* ¶ 11, 16. OMB's guidance is not finalized until an agency obligates apportioned funds. *Id.* OMB's interim apportionment decisions are, therefore, privileged because they are "crucial to fulfillment of the unique role and responsibilities of the executive branch." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997) (citations omitted).

The deliberative process privilege—the most common executive privilege—is a privilege grounded in the separation of powers aimed at ensuring "that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism" and preventing "disclosure of proposed policies before they have been finally formulated or adopted." *Judicial Watch, Inc. v. United States Dep't of Justice*, 20 F.4th 49, 54 (D.C. Cir. 2021) (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." (quotation marks omitted)).

The deliberative process privilege, therefore, shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted); *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021) (The privilege "protects from disclosure documents

generated during an agency's deliberations about a policy."). The privilege applies to documents that are predecisional and deliberative. *In re Sealed Case*, 121 F.3d at 737 (citing *Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993)); *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995). "The privilege applies when a document is "(1) predecisional, that is, 'antecedent to the adoption of agency policy,' and (2) deliberative, that is, actually 'related to the process by which policies are formulated.'") (quoting *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988)).

OMB's apportionment of funds involves a complex, deliberative process laden with policy considerations. Kineenn Decl. ¶¶ 11–12. Defendants do not dispute that apportionments are legally binding OMB-approved plans, in that agencies are required to act consistent with OMB's guidance on spending. *See* OMB Circular No. A-11 § 120.1; Pl.'s Mot. at 13 (quoting same). The apportionment, however, does not bind OMB, which remains free to change the allocations, as OMB Circular No. A-11 notes. *See* OMB Circular No. A-11 § 120.48. An apportionment is the initial step in the Executive's spending determination. *Id.* ¶ 11, 16. It is OMB's initial distribution of funds to accomplish policy goals. *Id.* ¶¶ 10–11. Apportionments are routinely subject to change based on OMB's continued monitoring of agencies' actions and re-evaluation of policy goals. *Id.* ¶¶ 10–11. Specifically, "if a significant economic, foreign, or other policy shift occurs, the funds apportioned for those programs may need to change. One program might then have its apportionment reduced, while another program's apportionment would be increased." *Id.* ¶ 12. Thus, there is more than a "mere possibility" that OMB will reconsider budgetary allocations, *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012)—that is in fact the nature of the process.

Requiring OMB to reveal its apportionments results in disclosure of predecisional, deliberative information has a chilling effect on OMB's decision making, including through OMB's omission of key details regarding the agency action it seeks prior to making funds available for disbursement. For example, in the past, OMB apportionments for projects or activities (category B apportionments) included "identifying references for the individual loan borrowers" along with "provisional financial commitments subject to ongoing review and potential re-apportionment." *Id*. ¶ 14. Following enactment of the publication requirement, OMB removed sensitive information from apportionment documents, "which has impeded OMB's ability to most efficiently provide direction to and receive information from agencies." *Id*. ¶ 15. While apportionment documents still contain deliberative information, *id*. ¶ 16, OMB has been forced to omit important context that "could reveal information about the Executive Branch's internal planning and strategy," *id*. ¶ 15. Therefore, these statutes requiring revealing the apportionment information "impair" the performance of the Executive's duties.

Apportionment documents reflect interim deliberations that are part of the Executive's broader spending policy. The Constitution confers on the President the duty to take care that the laws are faithfully executed. When it comes to apportionment authority in particular, it is up to the President to apportion funds as he "considers appropriate." 31 U.S.C. § 1512(b)(2). As the Supreme Court emphasized in *Bowsher*, "exercise[ing] judgment concerning facts that affect the application" of a statute and "interpret[ing] the provisions of the [statute] to determine what budgetary calculations are required," is "the very essence of execution of the law." 478 U.S. at 733.

Specifically, the 2023 Act's requirement that OMB publish information automatically within two days impermissibly burdens the administration of the apportionment process and

creates a heightened risk of disclosure of deliberative information.  Requiring OMB to disclose approved apportionments hinders the prudent obligation of an appropriation and the execution of an agency program, project, or activity at the risk of divulging deliberative communications.  For example, following the issuance of an apportionment, OMB works with agencies to determine the best use of appropriated funds and may advise agencies regarding the President's priorities for funds or on sensitive matters touching on national security or foreign policy.  Kinneen Decl. ¶ 17.  Due to the expedited timeline for public disclosure, OMB is often forced to omit key policy information from apportionments, thereby forcing it "to choose between compromising confidentiality and using its apportionment authority as Congress intended."  *Id.* ¶ 18.

By comparison, FOIA provides at least twenty business days, plus an additional ten days in unusual circumstances, for agencies to collect, review, and produce records in response to specific requests.  5 U.S.C. § 552(a)(6)(A).  That process includes determining whether predecisional, deliberative information is exempt from disclosure.  *Id.* § 552(b)(5).  Similarly, when Congress requests information or even subpoenas records from the Executive Branch, agencies engage in the accommodation process, which invariably takes longer than two days. *See United States v. American Tel. & Tel. Co.*, 567 F.2d 121 (D.C. Cir. 1977).  Yet the 2022 and 2023 Acts require the automatic publication of information in a mere two days.  Without the two-day requirement, Plaintiff's "contrary to law" claim is reduced to an "unreasonable delay" claim under the APA, which is subject to higher standard that Plaintiff cannot meet.  *See Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 94 (D.D.C. 2020) ("A six-factor balancing test governs whether agency action, like waiver-eligibility adjudication, has been unreasonably delayed. (citing *Research & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984)).

In sum, the 2022 and 2023 Acts' disclosure requirements amount to excessive and impermissible micromanagement, interfering with the President's constitutional authority over the implementation of appropriations and his discretion in executing the laws.  *See* 28 Op. O.L.C. 79, 81 (2004) (Department of Justice's Office of Legal Counsel letter noting that "the 'right of disclosure' statutes prohibit Executive Branch supervision of employee disclosures unconstitutionally limits the ability of the President and his appointees to supervise and control the dissemination of privileged government information."); 6 Op. O.L.C. 632, 638 (1982) ("[T]he President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities."); 1 Op. O.L.C. 16, 17 (1977) (similar analysis of Inspector General reporting requirements).  Accordingly, the mandatory and automatic reporting requirements are foreclosed by the deliberative process privilege and prohibited by the Constitution.

### C.  CREW Cannot Establish Likelihood Of Success On Its PRA Claims.

CREW asserts that Defendants have violated the statutory provisions of the PRA that state that agencies shall "ensure that the public has timely and equitable access to the agency's public information," 44 U.S.C. § 3506(d)(1), and "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products," *id*. § 3506(d)(3); *see* ECF No. 9-1 at 23–25.  CREW claims that Defendants have failed to comply with the "requirement to provide timely and equitable access to public information and the requirement to provide notice before terminating significant information dissemination products."  ECF No. 9-1 at 23.

CREW's argument that Defendants violated the PRA because the "2023 Act requires

OMB" to post apportionment documents fails.  *See* ECF No. 9-1 at 24.  As previously explained,

the apportionment documents are interim, deliberative documents that are exempt from public

disclosure.  And any failure to provide advance notice here was harmless error because the letter

notifying Congress was sent a short time afterwards.  Accordingly, OMB's compliance with the

2023 Act is not an adequate basis for a PRA claim.

## II.    **CREW Has Failed to Demonstrate that It Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief.**

CREW has also failed to demonstrate that it will suffer irreparable harm if the Court does

not enter the requested preliminary injunction.  To demonstrate irreparable harm, CREW must

meet a "high standard" of showing that it faces injuries that are "certain, great, actual, and

imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation

omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at

297; *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (Harm must be

"certain and great, actual and not theoretical, and so imminent that there is a clear and present

need for equitable relief to prevent irreparable harm" (citation and alteration omitted)).  Making

that showing requires proof that the harm it identifies "is certain to occur in the near future."

*Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  "[T]he failure to show

a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary

injunction] motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018).

First, a generalized claim that there exists a "public interest in restoring immediate access

to the apportionment information," is insufficient to establish irreparable harm.  *See* ECF No. 9-1

at 9; *id*. at 28 ("Prompt access to the apportionment information is critical to CREW's role in

informing the national debate on government funding and to Congress's and the public's ability

to promptly discuss or respond to any possible legal violations.").  CREW does not represent the

public here, and "injuries to third parties are not a basis to find irreparable harm." *Alcresta*

*Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018); *State v. Musk.*, ---F. Supp.

3d ---, 2025 WL 520583, at *4 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties

does not satisfy the irreparable harm requirement in the context of emergency injunctive relief,

which must instead be connected specifically to the parties before the Court." (quoting *Church v.*

*Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Assuming the public has an overarching desire

for apportionment information, such desire does not support a finding of irreparable harm *to*

*CREW*.

Second, CREW's claim that "[p]rompt access to the apportionment information is critical

to [its] role in informing the national debate on government funding" similarly fails.  *See* ECF

No. 9-1 at 28.  CREW relies on *Newby* for the proposition that irreparable harm exists if a

defendant's actions prevent an organization from fulfilling its mission.  ECF No. 9-1 at 26.  In

*Newby*, voting-rights organizations sought a preliminary injunction to enjoin several states'

added proof of citizenship requirement as part of the voter registration process.  838 F.3d at 4.

The organizations claimed they would be irreparably harmed because the "proof-of-citizenship

requirement substantially limited the ability . . .  to successfully register voters." *Id*. at 8.  The

Court found that the organizations established irreparable harm because "new obstacles

unquestionably ma[d]e it more difficult for the [organizations] to accomplish their primary

mission of registering voters." *Id*. at 9.

CREW has not made a similar showing.  CREW's stated focus is the "[m]onitoring [of]

the Executive Branch's spending of congressionally appropriated funds." *Id*. at 18.  CREW has

not shown that the apportionment database is its exclusive source of information of government

spending or that it will fail to satisfy its monitoring goals without the apportionment database.

CREW only submits that the apportionment data is necessary to monitor apportionments to the U.S. DOGE Service, *see* ECF No. 9-3 ¶ 27, but a challenge in monitoring one sub-set of apportionments does not constitute an impediment of CREW's broad mission. CREW remains free to submit FOIA requests to the agencies it wishes to monitor, and it is able to obtain and scrutinize Congressional reports on government spending. CREW may also consult other government databases, which contain information about the Executive's spending decisions. *See* OMB, SF 133 Report on Budget Execution and Budgetary Resources; Dept. of the Treasury, Financial Report of the United States Government.

Third, CREW has failed to show that injunctive relief is necessary pending the resolution of this case. In *Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*, the District Court determined that the plaintiff failed to establish irreparable harm as a result of the defendant's failure to "to expeditiously process" a FOIA request. No. 25-CV-511 (CRC), 2025 WL 752367, at *5, 9 (D.D.C. Mar. 10, 2025), *reconsideration denied*, No. 25-CV-511 (CRC), 2025 WL 863947 (D.D.C. Mar. 19, 2025). The plaintiff claimed that an injunction was necessary prior to the date the government's continuing resolution was set to expire because the plaintiff was required "to inform public debate over appropriations legislation." *Id*. at *5. The court concluded that injunctive relief was not warranted because the requested information would "not go 'stale' for [plaintiff]'s own asserted purpose." *Id*. at *9–10. The court explained that because the plaintiff's request was not tied to a singular event with a certain end date (*i.e.*, "a census, congressional election, or impeachment process"), "after which the requested records would no longer have anything but 'historical value,'" the records would "remain valuable and relevant" to Congress and the public. *Id*. (citing *Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 101 (D.D.C. 2020)).

Here, too, CREW has failed to show that it will be irreparably harmed in the absence of a mandatory injunction ordering Defendants to post all apportionment documents and footnotes. Although CREW generally claims that apportionment documents have "substantially less value" after the passage of "months or years," ECF No. 9-1 at 28, CREW does not claim that the documents will be "stale" or otherwise merely "historical" to the extent this case is ultimately resolved in its favor.  At bottom, there is no need for preliminary injunctive relief now because there is no date certain by which CREW needs to review and analyze spending documents for the government writ large.  To the extent CREW prevails in this case, it will be afforded access to the apportionment documents and may resume review in accordance with its mission.

## III.    The Balance of the Equities and the Public Interest Support Rejection of CREW's Motion.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  "[T]hwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020).  In this setting, granting the preliminary injunction that CREW seeks would require unconstitutional infringement upon Executive power.  *See NAACP v. U.S. Department of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025) ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (citation omitted)).

## IV.    CREW Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief

The Court should order security with any preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives

security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require CREW to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## V.    CREW's Partial Motion for Summary Judgment Fails

CREW moves for partial summary judgment on its claim that OMB's failure to maintain a publicly available apportionment database is contrary to law—specifically, the 2022 and 2023 Acts and the PRA. Because CREW has not established a likelihood of success on the merits of that claim, as explained above, it is not entitled to summary judgment.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny CREW's motion for a preliminary injunction and for partial summary judgment.

Dated: April 30, 2025

                Respectfully submitted,

                YAAKOV M. ROTH
                Acting Assistant Attorney General

                MARCIA BERMAN
                Assistant Branch Director

                */s/ Heidy L. Gonzalez*
                HEIDY L. GONZALEZ
                (FL Bar #1025003)
                CARMEN M. BANERJEE
                (D.C. Bar #497678)
                Trial Attorneys
                United States Department of Justice

Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*