**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>　　　　Defendants. | Civil Action No. 25-1051 (EGS) |
| PROTECT DEMOCRACY PROJECT,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. OFFICE OF MANAGEMENT AND BUDGET, et al.,<br><br>　　　　Defendants. | Civil Action No. 25-1111 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Under the United States Constitution, it is the job of Congress to decide how American taxpayer dollars are spent, including how many dollars to spend and on what priorities to spend them. Once Congress authorizes funding through an appropriations bill, and the President signs the bill into law, constitutional responsibility shifts to the Executive Branch to allocate the funds according to congressional instructions. The

decisions about how to allocate funds are called "apportionments," and they are used to ensure that the Executive Branch does not spend more or less than Congress appropriated. Defendants in this lawsuit are the Executive Branch officials responsible for apportioning congressionally approved spending.

To facilitate congressional oversight of the apportionment decisions of the Executive Branch and provide the public with insight into the decisions, in 2022, Congress passed, and the President signed into law, a statute requiring the Executive Branch to publish its apportionment decisions on a publicly available online database within two days of the decision. Thereafter, the Executive Branch created a public database (the "Public Apportionments Database") and complied with this law until late March 2025 when, without notice, it took the database offline. Defendants argue that this public disclosure law is an unconstitutional encroachment on the Executive Branch's decision-making authority. Relying on an extravagant and unsupported theory of presidential power, Defendants claim that their apportionment decisions—which are legally binding and result in the actual spending of public funds—cannot be publicly disclosed because they are not final decisions about how to administer the spending of public funds.

However, the law is clear: Congress has sweeping authority to require public disclosure of how the Executive Branch is

apportioning the funds appropriated by Congress. Under the law, the decision of the Executive Branch must be made public within two days of the decision. And if Defendants need to make a new decision, that new decision must also be made public within two days. Plaintiffs in this lawsuit monitor these decisions, and they have the right to report on and re-publish this information. As explained in this Memorandum Opinion, there is nothing unconstitutional about Congress requiring the Executive Branch to inform the public of how it is apportioning the public's money. Defendants are therefore required to stop violating the law!

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Protect Democracy Project ("Protect Democracy") filed these lawsuits against Defendants Office of Management and Budget ("OMB") and Director Russell Vought ("Director Vought") (collectively, "Defendants") to challenge Defendants' removal of the Public Apportionments Database. CREW's two-Count Complaint alleges, among other things, that Defendants' actions violate the Administrative Procedure Act ("APA") and the Paperwork Reduction Act ("PRA"). Compl., Civil Action No. 25-1051 ("CREW Compl."), ECF No. 1 ¶¶ 26-34.[1] Protect

---

[1] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

Democracy's six-Count Complaint alleges, among other things, that Defendants' actions violate the APA. Compl., Civil Action No. 25-1111 ("Protect Democracy Compl."), ECF No. 1 ¶¶ 44—77.

Pending before the Court are each Plaintiff's Motion for a Preliminary Injunction and/or Partial Summary Judgment.[2] *See* Mot. for Prelim. Inj. & Partial Summ. J. ("CREW Mot."), ECF No. 9 in 25-cv-1051; Mot. for Prelim. Inj. or in the Alternative Partial Summ. J. ("Protect Democracy Mot."), ECF No. 18 in 25-cv-1111. At oral argument, the parties agreed that there are no genuine issues of material fact that would preclude the Court from considering the merits of their claims. CREW Hr'g Tr., ECF No. 24 at 46:11-12, 97:7-22. Accordingly, Plaintiffs requested that the Court forego consideration of their requests for a preliminary injunction and address their requests for partial summary judgment.[3] *Id.* at 46:16-19. Both Plaintiffs represented that if the Court enters partial summary judgment in their favor and issues the requested injunction, there would be no need for

---

[2] CREW seeks partial summary judgment on its APA claim that Defendants' actions are unlawful and contrary to law. Hr'g Tr., ECF No. 24 in 25-cv-1051 (May 9, 2025) ("CREW Hr'g Tr.") at 45:20-25. CREW also seeks summary judgment on its PRA claims. Protect Democracy seeks partial summary judgment on Count One of its Complaint. *Id.* at 44:20-21.

[3] Defendants note that were the Court to address the merits, "we would want to make sure that the Court's order is consistent with the relief requested and does not go beyond the partial motion for summary judgment." CREW Hr'g Tr., ECF No. 24 at 95:6-8.

the Court to address the remaining claims in their respective
Complaints. *Id.* at 116:24-117:6, 120:10-15. The Court agrees
that there are no genuine issues of material fact that would
preclude ruling on Plaintiffs' motions for partial summary
judgment at this juncture. Accordingly, the Court will forego
the preliminary injunction analysis and address the merits of
Plaintiffs' motions for partial summary judgment.

Upon careful consideration of the motions, responses and
replies thereto, the parties' oral arguments, and the entire
record herein, the Court **GRANTS IN PART** CREW's Motion for
Partial Summary Judgment as to its claims that the Defendants'
removal of the Public Apportionments Database violates the 2022
and 2023 Acts and violates the PRA's dissemination of
information requirement, and **DENIES IN PART** CREW's Motion for
Partial Summary Judgment as to its PRA notice claim. The Court
**GRANTS** Protect Democracy's Motion for Partial Summary Judgment
on its claim that Defendants' removal of the Public
Apportionments Database violates the 2022 and 2023 Acts. The
Court **DENIES AS MOOT** Plaintiffs' Motions for a Preliminary
Injunction.

## I.   Background

### A. Overview of Apportionment Process

The Appropriations Clause of the United States Constitution
grants Congress the exclusive power to appropriate funds. *See*

U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"). Congress's "power of the purse" is an important check on separation of powers, ensuring that the Executive does not have "unbounded power." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015) (citing *U.S. Dep't of Navy v. Fed. Lab. Relations Auth.*, 665 F.3d 1339, 1347 (2012)). "Under the Appropriations Clause, an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024).

To protect and enforce its power under the Appropriations Clause, Congress has enacted a number of "fiscal control" statutes. *See* Sean M. Stiff, Cong. Rsch. Servs., R46417, Congress's Power Over Appropriations: Constitutional & Statutory Provisions (2020). Relevant here are the Anti-Deficiency Act and the Impoundment Control Act ("ICA"). The Anti-Deficiency Act "prevents federal officers from 'mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) (alteration in original) (quoting 31 U.S.C. § 1341(a)(1)(A)). Additionally, once Congress appropriates funds, the Anti-Deficiency Act requires the President to apportion the funds. 31 U.S.C. § 1513(b)(1). The President has delegated this authority

to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987).

An apportionment is "an OMB-approved plan to use budgetary resources." OMB, Circular A-11 § 120.1. Apportionments are employed to "prevent federal officials from obligating or expending funds at a rate that would prematurely exhaust the funds." Taylor N. Riccard, et al., Cong. Rsch. Serv., RS21665, Office of Management and Budget (OMB): An Overview (updated June 2023). Accordingly, apportionments typically "release one part of an agency's appropriation . . . followed by one or more subsequent apportionments releasing the remainder of that appropriation." Decl. of Samuel Bagenstos ("CREW–Bagenstos Decl."), Ex. 3, ECF No. 9-4 in 25-cv-1051 ¶ 14.

In 1974, the ICA made it clear that the Executive Branch cannot use its apportionment authority to withhold congressionally appropriated funds from agencies or programs that do not comport with the Executive's plans or policies. *See* 31 U.S.C. § 1512(c) (establishing the only instances in which a reserve of funds may be created). *See generally* 2 GAO, Principles of Federal Appropriations Law (3d ed. 2006). The ICA requires the President to notify both Houses of Congress whenever he determines that appropriated funds will be withheld. 2 U.S.C. § 683.

### 1. The 2022 and 2023 Appropriations Acts

Prior to 2022, the ability of Congress to identify whether the Executive Branch was withholding or misusing appropriated funds was limited. It often relied on complaints by whistleblowers or an agency's noncompliance with an apportionment. *See* Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359, 372 (2024). In response to growing concerns about the potential abuse of the apportionment process and misuse of apportioned funds,[4] Members of the House of Representatives proposed a series of reforms to strengthen government oversight and accountability. These efforts included the Protecting Our Democracy Act ("PODA"), a portion of which would have required OMB to post apportionment data for the public. *See* H.R. 5314, 117th Cong. § 2 (2021). Congress ultimately included the disclosure provision from PODA

---

[4] In 2020 the United States Government Accountability Office ("GAO") determined that "OMB withheld from obligation approximately $214 million appropriated to [the Department of Defense] for security assistance to Ukraine." GAO, *Withholding of Ukraine Security Assistance*: Decision File B-331564 (Jan. 16, 2020), https://www.gao.gov/assets/b-331564.pdf. The GAO concluded that the withholding of funds violated the ICA. *Id.* at 2. These actions were the basis for the first Impeachment of President Trump during his first term in office and came to the attention of Members of Congress by means of an August 2019 whistleblower complaint. *See e.g.*, Library of Congress Research Guides, Donald J. Trump, https://guides.loc.gov/federal-impeachment/donald-trump (last visited July 9, 2025).

in the Consolidated Appropriations Act, 2022 ("2022 Act") in

March 2022. Specifically, the 2022 Act required OMB to

> implement[] [] an automated system to post
> each document apportioning an appropriation .
> . . including any associated footnotes, in a
> format that qualifies each such document as an
> Open Government Data Asset (as defined in
> section 3502 of title 44, United States Code),
> not later than 2 business days after the date
> of approval of such apportionment[.]

Pub. L. No. 117-103, div. E, tit. II, § 204(b), 136 Stat. 257

(codified at 31 U.S.C. § 1513 note).[5] In accordance with this

requirement, in July 2022, OMB created the Public Apportionments

Database, located at https://apportionment-public.max.gov, a

publicly available website. *See* OMB Circular No. A-11 § 120.4.

In December 2022, Congress made the posting requirement in

the 2022 Act permanent as part of the Consolidated

Appropriations Act, 2023 ("2023 Act"). *See* Pub. L. No. 117-328,

div. E, tit. II, § 204(1), 136 Stat. 4459, 4667 (Dec. 29, 2022)

(codified at 31 U.S.C. § 1513 note). The 2023 Act provided:

> In fiscal year 2023 and each fiscal year
> thereafter . . . [OMB] shall operate and
> maintain the automated system required to be
> implemented by [the 2022 Act] . . . and shall
> continue to post each document apportioning an
> appropriation, pursuant to section 1513(b) of
> title 31, United Sates Code, including any
> associated footnotes[.]

---

[5] "Footnotes appear as textual descriptions on specific tabs in
the apportionment file, and typically provide additional
information or direction associated with one or more lines on
the request." OMB Circular No. A-11 § 120.34. As such, the
footnotes are part of the apportionment. *Id.*

*Id.*

## B. OMB's Removal of the Public Apportionments Database

From July 2022 until its removal, OMB operated and maintained the Public Apportionments Database. *See* OMB Circular No. A-11 § 120.4 ("OMB is required to post all approved apportionment documents on a public website. Those apportionments can be found here: https://apportionment-public.max.gov/.").

On or about March 24, 2025, Defendants removed the Public Apportionments Database from the publicly available website. *See* Decl. of Christina L. Wentworth ("CREW-Wentworth Decl."), Ex. 2, ECF No. 9-3 in 25-cv-1051 ¶ 23. When accessed now, the website displays a message indicating "Page Not Found." *See id.*; MAX Homepage, https://apportionment-public.max.gov (last visited July 16, 2025). On the same day, Members of Congress, including Democratic leaders on the Senate and House Appropriations Committees, issued press releases calling attention to the issue. *See* CREW Mot., ECF No. 9 at 16 (citing Press Release, Rosa DeLauro & Patty Murray, *What Are They Hiding? DeLauro, Murray Demand OMB Promptly Restore Access to Website Detailing Federal Spending Allocations, As Federal Law Requires*, DEMOCRATS APPROPRIATIONS COMMITTEE (Mar. 24, 2025), https://democrats-appropriations.house.gov/news/press-releases/what-are-they-hidingdelauro-murray-demand-omb-promptly-restore-access-website;

Press Release, *Boyle Demands White House Comply with the Law, Restore Public Access to Budget Data*, HOUSE COMMITTEE ON THE BUDGET (Mar. 24, 2025)).

Five days later, on March 29, 2025, Director Vought sent a letter to Republican and Democratic leadership of the Senate and House Appropriations Committee, some of whom had raised concerns about the database's removal, informing them that OMB "will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." *See* Decl. of Kelly Kinneen, Ex. C, Letters from Russell Vought to Committee on Appropriations (Mar. 29, 2025), ECF No. 18-1 in 25-cv-1051 at 22 ("OMB Letter"). The letter further stated:

> OMB has determined that it can no longer operate and maintain this system because it requires the disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change.

> Such disclosures have a chilling effect on the deliberations within the Executive Branch. Indeed, these disclosure provisions have already adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness in supervising agency spending. Moreover, apportionments may contain sensitive information, the automatic public

> disclosure of which may pose a danger to
> national security and foreign policy.

*Id.*

### C. The Plaintiffs and Their Interest in the Information

#### 1. CREW

CREW is "a non-partisan, non-profit government watchdog organization based in Washington, D.C." CREW-Wentworth Decl., Ex. 2, ECF No. 9-3 ¶ 4. CREW's mission is to

> protect[] the rights of citizens to be
> informed about the activities of government
> officials and agencies; monitor[] and inform[]
> the public about key government activities,
> including the executive branch's use of
> appropriated funds; ensur[e] transparency,
> ethics, and integrity in government; and
> empower[] citizens to have an influential
> voice in government decisions and in the
> government's decision-making process.

*Id.* Relying on government records and data made available by Freedom of Information Act ("FOIA") requests or other statutes requiring public disclosure, CREW is able to "create public-facing reports, draft administrative complaints and requests for investigation, and craft targeted FOIA requests[,]" all of which CREW makes available to the public via its website. *Id.* ¶ 5.

CREW "uses a combination of research, litigation, and advocacy" to advance its mission of "protecting the rights of citizens to be informed about the activities of government officials and agencies," including how appropriated funds are used. *Id.* ¶¶ 4-5. To that end, CREW relies on the information

uploaded to the Public Apportionments Database "to monitor
apportionments for potential withholdings." *Id.* ¶¶ 9, 26, 27.
CREW reports its findings on its publicly available website and
utilizes the information to submit FOIA requests for further
investigation. *Id.* ¶¶ 19-21. Without access to the apportionment
information on the database, CREW is unable to ensure "[p]rompt
public awareness of any use of the apportionment process to
withhold funds[,]" or alert Congress or the GAO of improper
withholdings, which are critical to CREW's mission. *Id.* ¶¶ 12,
14.

### 2. Protect Democracy Project

Protect Democracy is a "nonpartisan, nonprofit organization
dedicated to preventing American democracy from declining into a
more authoritarian form of government." Protect Democracy Mot.,
ECF No. 18 at 11. The organization works to "educat[e] the
public about democratic norms and conduct[] research, analysis,
and technology developments to promote fact-based debate[,]"
including Congress's power of the purse. *Id.* After the creation
of the Public Apportionments Database, Protect Democracy's work
also included training congressional staff on how to utilize the
database. *Id.* at 12.

Given "shortcomings" with OMB's database, Protect Democracy
launched OpenOMB.org ("OpenOMB") in October 2024. *Id.* "OpenOMB
aims to make oversight of OMB's apportionments easier for

Congress, the press, and the public by providing easier access to apportionment files." *Id.* Protect Democracy asserts that OpenOMB's search is more "user-friendly" because it "allows users to search for information in and across apportionments." *Id.* To feed its site, Protect Democracy pulled data from the Public Apportionments Database every day. *Id.* OpenOMB's users include "Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community." Decl. of William P. Ford ("Protect Democracy-Ford Decl."), Ex. 1, ECF No. 18-4 in 25-cv-1111 ¶ 11. OpenOMB received 41,000 page views between its launch on October 2, 2024, and the removal of the Public Apportionments Database on March 24, 2025. *Id.* ¶ 12. At the time the Public Apportionments Database was removed, Protect Democracy was developing a "notification feature" set to launch on OpenOMB. *Id.* ¶¶ 16-17. Without the apportionment data previously provided on the Public Apportionments Database, Protect Democracy is unable to make apportionments available via OpenOMB, thus "Protect Democracy can no longer provide updated information about apportionments to Congress, the press, and the public . . . or otherwise use the site to monitor . . . for potential violations of law." *Id.* ¶ 19.

### D. Procedural History

CREW and Protect Democracy initiated actions against Defendants on April 8, 2025, and April 14, 2025, respectively, challenging Defendants' removal of the Public Apportionments Database. *See* CREW Compl., ECF No. 1; Protect Democracy Compl., ECF No. 1. On April 18, 2025, CREW filed a Motion for Preliminary Injunction and Partial Summary Judgment, requesting that the Court schedule a hearing. *See* CREW Mot., ECF No. 9. On April 21, 2025, the Court entered a briefing schedule and set a preliminary injunction hearing for May 9, 2025. Minute Order (Apr. 21, 2025).

On April 22, 2025, Protect Democracy filed a Motion for Expedited Summary Judgment, or in the Alternative a Preliminary Injunction or a Writ of Mandamus. *See* Pl.'s Mot. for Expedited Summ. J., or in the Alternative a Preliminary Inj. or Writ of Mandamus, ECF No. 13 in 25-cv-1111. The next day, the Court entered a briefing schedule. Minute Order (Apr. 23, 2025). On April 25, 2025, Protect Democracy filed an Unopposed Motion to Coordinate Preliminary Injunction Proceedings. *See* Mot. to Coordinate, ECF No. 16 in 25-cv-1111. Protect Democracy indicated that it "would withdraw its current motion for expedited summary judgment and instead file a preliminary injunction motion seeking identical relief as the pending motion in *CREW*, limited to the same [APA] claim that both [Plaintiffs]

15

advanced in their motions." *Id.* at 1. The Court granted the
Motion to Coordinate, and on April 27, 2025, Protect Democracy
filed a Motion for a Preliminary Injunction or in the
Alternative Partial Summary Judgment. *See* Protect Democracy
Mot., ECF No. 18 in 25-cv-1111.

Defendants filed their oppositions to CREW and Protect
Democracy's motions on April 30 and May 2, 2025, respectively.
*See* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. & Partial Summ.
J. ("CREW-Opp'n"), ECF No. 18 in 25-cv-1051; Defs.' Opp'n to
Pl.'s Mot. for Prelim. Inj. & Partial Summ. J. ("Protect
Dmocracy-Opp'n"), ECF No. 19 in 25-cv-1111. CREW and Protect
Democracy filed reply briefs on May 4 and May 5, 2025,
respectively. *See* Reply Mem. of Law in Support of Pl.'s Mot. for
Prelim. Inj. & Partial Summ. J., ECF No. 21 in 25-cv-1051 ("CREW
Reply"); Pl.'s Reply in Support of its Mot. for Prelim. Inj. or
in the Alternative Partial Summ. J., ECF No. 20 in 25-cv-1111
("Protect Democracy Reply"). Later the same day, Defendants
filed a sur-reply in each case. *See* Defs.' Sur-Reply to Pl.'s
Mot. for Preliminary Inj. & Partial Summ. J ("CREW-Sur-reply"),
ECF No. 22 in 25-cv-1051; Defs.' Sur-Reply to Pl.'s Mot. for
Preliminary Inj. & Partial Summ. J ("Protect Democracy-Sur-
reply"), ECF No. 21 in 25-cv-1111.

On May 9, 2025, the Court held a hearing on CREW and
Protect Democracy's Motions. Thereafter, on June 2, 2025, the

Court directed Plaintiffs to file supplemental briefing
addressing the type of relief sought if the Court were to forego
a preliminary injunction analysis and rule on their motions for
partial summary judgment. *See* Minute Order in 25-cv-1051 (June
2, 2025); Minute Order in 25-cv-1111 (June 2, 2025). Plaintiffs
each filed a supplemental memorandum addressing the issue of
relief on June 9, 2025. *See* Pl.'s Suppl. Br. in Resp. to Court's
Min. Order ("CREW Suppl."), ECF No. 28 in 25-cv-1051; Protect
Democracy's Suppl. Br. ("Protect Democracy Suppl."), ECF No. 28
in 25-cv-1111. Defendants filed their responses in each case on
June 16, 2025, *see* Defs.' Resp. to Pl.'s Suppl. Br. ("Defs.'
Suppl.—CREW"), ECF No. 29 in 25-cv-1051; Defs.' Resp. to Pl.'s
Suppl. Br. ("Defs.' Suppl.—Protect Democracy"), ECF No. 29 in
25-cv-1111; and Plaintiffs filed their replies on June 18, 2015,
*see* Pl.'s Reply to Defs.' Resp. to Pl.'s Suppl. Br. ("CREW
Suppl. Reply"), ECF No. 30 in 25-cv-1051; Protect Democracy's
Reply in Support of Suppl. Br. ("Protect Democracy Suppl.
Reply"), ECF No. 31 in 25-cv-1111. The motions are now ripe for
the Court's adjudication.

## II. Legal Standard

### A. Administrative Procedure Act

The APA provides that "[a] person suffering legal wrong
because of agency action, or adversely affected or aggrieved by
agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. § 702. The Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "in excess of [the agency's] statutory jurisdiction, authority, or limitations, or short of a statutory right[.]" *Id.* § 706(2)(A), (C).

### B. Paperwork Reduction Act

The PRA was enacted in 1980 to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," 44 U.S.C. § 3501(2); and "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public[.]" *Id.* § 3501(7). Relevant here, the PRA requires each agency to "ensure that the public has timely and equitable access to the agency's public information[.]" *Id.* § 3506(d)(1). "Public information" is defined as "any information regardless of form or format, that an agency discloses, disseminates, or makes available to the public[.]" *Id.* § 3502(12). Further, the Act requires that the agency "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products[.]" *Id.* § 3506(d)(3).

### C. Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment, which are granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In APA cases, however, "the summary judgment standard functions slightly differently, because the reviewing court generally . . . reviews the agency's decision as an appellate court addressing issues of law." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (alteration in original) (quoting *Pol'y & Rsch, LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018)). "[T]he district judge sits as an appellate tribunal[,] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III. Analysis

Defendants argue that Plaintiffs are not entitled to partial summary judgment for two reasons: (1) Plaintiffs lack standing to challenge the removal of the database; and (2) the 2022 and 2023 Acts are an unconstitutional infringement on Executive power and privilege. *See* CREW-Opp'n, ECF No. 18 at 18-

30.[6] Defendants also argue that CREW lacks standing for its PRA claim, CREW-Opp'n, ECF No. 18 at 23; and that on the merits, there was no violation of the PRA because: (1) "the apportionment documents are interim, deliberative documents that are exempt from public disclosure," and (2) "any failure to provide advance notice [] was harmless error because the letter notifying Congress was sent a short time afterward," *id*. at 30-31.

### A. Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. CONST. art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see Lujan v. Nat'l Wildlife Fed'n*, 504 U.S. 555, 560 (1990) (calling standing "the irreducible constitutional minimum"); *see also Jibril v. Mayorkas*, No. 19-cv-2457, 2023 WL 2240271, at *4 (D.D.C. Feb. 27, 2023) ("One way a court might lack subject-matter jurisdiction is if a plaintiff lacks Article III

---

[6] Unless otherwise noted, Defendants' arguments in response to CREW and Protect Democracy's motions are substantially identical. For clarity, the Court only cites to one of the Defendants' oppositions.

standing." (citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.
Cir. 1987))). The law of Article III standing "is built on
separation-of-powers principles" and "serves to prevent the
judicial process from being used to usurp the powers of the
political branches." *Clapper*, 568 U.S. at 408.

To establish standing, "a plaintiff must show (1) an
'injury in fact,' (2) a sufficient 'causal connection between
the injury and the conduct complained of,' and (3) a
'likel[ihood]' that the injury 'will be redressed by a favorable
decision.'" *Susan B. Anthony List*, 573 U.S. at 157-58
(alteration in original) (quoting *Lujan*, 504 U.S. at 560-61).
"The party invoking federal jurisdiction bears the burden of
establishing these elements." *Lujan*, 504 U.S. at 561 (citing
*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231
(1990)). Courts have recognized that plaintiffs can establish
standing based on an informational injury. *See Am. Soc'y for the
Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d
13, 22 (D.C. Cir. 2011).

Under Supreme Court precedent, organizations may have
standing "to sue on their own behalf for injuries they have
sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379
n.19 (1982). "In doing so, however, organizations must satisfy
the usual standards for injury in fact, causation, and
redressability that apply to individuals." *Food & Drug Admin. v.*

*All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024) (citing
*Havens Realty Corp.*, 455 U.S. at 378-79).

### 1. Informational Standing

"The law is settled that a denial of access to information
qualifies as an injury in fact where a statute (on the
claimants' reading) requires that the information be publicly
disclosed and there is no reason to doubt their claim that the
information would help them." *Campaign Legal Ctr. v. FEC*, 31
F.4th 781, 783 (D.C. Cir. 2022) (quoting *Campaign Legal Ctr. &
Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020)). To
demonstrate an actionable informational injury, a plaintiff must
show: "(1) it has been deprived of information that, on its
interpretation, a statute requires the government or a third
party to disclose to it, and (2) it suffers, by being denied
access to that information, the type of harm Congress sought to
prevent by requiring disclosure." *Friends of Animals v. Jewell*,
828 F.3d 989, 992 (D.C. Cir. 2016) (citing FEC v. Akins, 524
U.S. 11, 21-22 (1998)); *see Elec. Priv. Info. Ctr. v.
Presidential Advisory Comm'n on Election Integrity*, 878 F.3d
371, 378 (D.C. Cir. 2017).

"The scope of the second part of the inquiry may depend on
the nature of the statutory disclosure provision at issue."
*Jewell*, 828 F.3d at 992. "In some instances, a plaintiff suffers
the type of harm Congress sought to remedy when it simply

's[eeks] and [is] denied specific agency records.'" *Id.*
(alteration in original) (quoting *Pub. Citizen v. U.S. Dep't of
Just.*, 491 U.S. 440, 449–50 (1989)). "In others, a plaintiff may
need to allege that nondisclosure has caused it to suffer the
kind of harm from which Congress, in mandating disclosure,
sought to protect individuals or organizations like it." *Id.*
(citing *compare Akins*, 524 U.S. at 21–23, *and Shays v. FEC*, 528
F.3d 914, 923 (D.C. Cir. 2008), *with Nader v. FEC*, 725 F.3d 226,
230 (D.C. Cir. 2013)).

"[T]he fact that a number of people could be similarly
injured does not render the claim an impermissible generalized
grievance[.]" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety
Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). And "[t]he fact
that other citizens or groups of citizens" are also deprived of
the information a plaintiff seeks "does not lessen [a
plaintiff's] asserted injury, any more than the fact that
numerous citizens might request the same information under the
Freedom of Information Act entails that those who have been
denied access do not possess a sufficient basis to sue." *Pub.
Citizen*, 491 U.S. at 449-50. Even if the statute "entitles the
public generally to the disclosure of" the information, "that
does not mean that the informational injury . . . is not
particular to Plaintiff." *Elec. Priv. Info. Ctr. v. Presidential*

*Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017).

CREW and Protect Democracy argue that they have suffered "quintessential informational injuries" as a result of OMB's removal of the Public Apportionments Database. *See* CREW Reply, ECF No. 21 at 7; Protect Democracy Reply, ECF No. 20 at 7-11. Defendants respond that CREW and Protect Democracy fail to meet either prong of this test as to the 2022 and 2023 Acts, and that CREW fails to satisfy either prong as to the PRA. CREW-Opp'n, ECF No. 18 at 22-23, Protect-Democracy-Opp'n, ECF No. 19 at 19-23.

### a. Plaintiffs Have Been Deprived of Information That, on their Interpretation, a Statute Requires Defendants to Disclose to Them

The 2022 and 2023 Acts plainly require OMB to make apportionment decisions publicly available within two business days of the approval of such apportionment and in a format that qualifies as an Open Government Data Asset. *See* 31 U.S.C. § 1513 note. The PRA plainly requires the public dissemination of an "agency's public information." 44 U.S.C. § 3506(d).

Defendants argue that Plaintiffs do not satisfy this prong for two reasons. First, CREW's reliance on the FOIA cases it cites is misplaced because CREW does not allege that it requested apportionment documents and was denied the documents. CREW-Opp'n ECF No. 18 at 21. This is a non-sequitur; the

informational standing precedents do not require a plaintiff to have specifically requested the information. *See supra*.

Second, Defendants argue that neither the 2022 nor the 2023 Acts, nor the PRA as to CREW, require disclosure of information specifically to CREW or Protect Democracy; rather they "require the government's disclosure of information to the public at large." CREW-Opp'n, ECF No. 18 at 22; Protect Democracy-Opp'n, ECF No. 19 at 22. However, Defendants cite no authority for the proposition that Plaintiffs must show that the laws require the information to be disclosed specifically to them. *See* CREW-Opp'n, ECF No. 18 at 22. And as Plaintiffs point out, the caselaw indicates that individualized entitlement to disclosure is not required. *See* CREW Reply, ECF No. 21 at 9-10 (citing *Campaign Legal Ctr.*, 31 F.4th at 790 (finding organization had informational standing because FECA requires that certain campaign finance information be made public); *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (plaintiff claimed that the statute at issue required disclosure to it and the public at large)); *see also* Protect Democracy Reply, ECF No. 20 at 8-9 (collecting cases). For these reasons, the Court concludes that Plaintiffs satisfy the first prong: the 2022 and 2023 Acts, and the PRA as to CREW, require the information to be disclosed to them as part of the public at large, and Defendants' removal of the Public Apportionments Database and failure to make public

this information deprives Plaintiffs of the information. *See e.g., Akins*, 524 U.S. at 20-25 (emphasizing that an "inability to obtain information" that Congress required to make public constitutes an injury in fact for Article III); *Jewell*, 828 F.3d at 992 ("[T]he existence and scope of an injury for informational standing purposes is defined by Congress: a plaintiff seeking to demonstrate that it has informational standing, generally 'need not allege any *additional* harm beyond the one Congress identified.'" (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 342 (2016))).

> **b. Plaintiffs Have Suffered, By Being Denied Access to the Information, the Type of Harm Congress Sought to Prevent by Requiring Disclosure**

Defendants acknowledge that the type of harm Congress sought to prevent in the 2022 and 2023 Acts by requiring disclosure of apportionments was the lack of transparency to the public at large and to Congress about the Executive Branch's apportionment decisions. Citing the legislative history of the 2022 and 2023 Acts, Defendants state that "[t]he 2022 and 2023 Acts are intended to provide the public with insights into government spending and to enable Congress to oversee the Executive Branch's apportionment of appropriated funds." CREW-Opp'n, ECF No. 18 at 22 (citing Financial Services and General Government Appropriations for 2023: Hearings Before the Subcomm.

on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt. 5, at 125 (2022) (The 2023 Act "will provide the public with insight into billions of dollars of federal spending, while ensuring this committee, and Congress, can perform its oversight work and ensure the executive branch is faithfully implementing appropriations law.")); *see also* Protect Democracy Mot., ECF No. 18 at 9–10 ("In a division-by-division summary of the [2022 Act], Representative Rosa DeLauro (then-Chairwoman of the House Appropriations Committee)" stated that the 2022 Act would make "apportionments of appropriations publicly available in a timely manner." (quoting Ex. 7, H.R. 2471, Funding for the People: Division-by-Division Summary of Appropriations Provisions, HOUSE COMMITTEE ON APPROPRIATIONS, ECF No. 18-10 in 25-cv-1111 at 19)). However, this purpose, Defendants claim, is distinct from CREW and Protect Democracy's interests in acting as "middlemen" or "government watchdogs." CREW-Opp'n, ECF No. 18 at 22; Protect Democracy-Opp'n, ECF No. 19 at 23.

With regard to CREW, Defendants argue that "CREW asserts an interest in using the database to play a watchdog function, as part of its [nonprofit] business plan." CREW Opp'n, ECF No. 18 at 23. "That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight." *Id.*

The Court concludes that Defendants' argument is devoid of merit. CREW has a statutory entitlement to the information, as does the public at large. Congress did not place restrictions on what the public can do with the information. That CREW, as a member of the public, disseminates the information as part of its advocacy work is not contrary to the type of harm Congress sought to prevent by requiring disclosure. Rather it is in furtherance of the purpose for which Congress enacted the 2022 and 2023 Acts. Furthermore, the harm to CREW exists independent of harm to Congress in not having access to the information.

With regard to Protect Democracy, Defendants similarly argue that "the injury Protect Democracy seeks to vindicate is the injury to its own proprietary interest in OpenOMB. That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight." Protect Democracy-Opp'n, ECF No. 19 at 23. Again, the Court concludes that Defendants' arguments are meritless. Protect Democracy uses the information to provide further transparency to the public—and to Congress—by means of the OpenOMB website. As with CREW, the use Protect Democracy makes of the information is not contrary to the type of harm Congress sought to prevent by requiring disclosure, but in furtherance of Congress's purpose. And again,

the harm to Protect Democracy exists independent of harm to Congress in not having access to the information.

In summary, CREW and Protect Democracy's use of the apportionment information fits squarely within Congress's goal of providing increased transparency into the Executive Branch's apportionment decisions. *Compare Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023) (finding plaintiff organization suffered type of harm Congress intended to prevent with the Sunshine Act where withheld meeting notices caused plaintiff to miss meetings it would have otherwise attended), *with EPIC*, 878 F.3d at 378 (concluding plaintiff organization failed to meet the second prong of the informational injury test where the underlying provision was "directed at individual privacy, which [was] not at stake for [the plaintiff]"). For all these reasons, the Court concludes that Plaintiffs are suffering the type of harm that Congress sought to prevent by requiring disclosure of the apportionment information.[7]

---

[7] To the extent the second prong requires Plaintiffs to establish that "there is no reason to doubt their claim that the information would help them," *Campaign Legal Ctr.*, 31 F.4th at 783 (quotation and citation omitted); there is no reason to doubt CREW's claim that the information would help it in its public education, legislative policy, and litigation work. *See* CREW Reply, ECF No. 21 at 10. Nor is there reason to doubt Protect Democracy's claim that the information would help it in its educational, research, and analytical work. Protect Democracy Mot., ECF No. 18 at 12.

With respect to CREW's dissemination of information claim pursuant to the PRA, Defendants argue that "the alleged harm to CREW's business model is not the type of harm Congress sought to prevent when enacting the PRA." CREW-Opp'n, ECF No. 18 at 23. The Court rejects this argument for the reasons explained above. With regard to CREW's notice claim pursuant to the PRA, Defendants argue that CREW "has not demonstrated any concrete harm stemming from Defendant's alleged non-compliance with the PRA's notice requirements." *Id*. CREW failed to respond to this argument. *See generally* CREW Reply, ECF No. 21. Accordingly, the Court considers it conceded. *Cf. Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries,* 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). CREW has therefore failed to satisfy its burden of establishing standing as to its PRA notice claim.

### c. Plaintiffs Have Established Particularized Injuries

Defendants argue that Plaintiffs lack standing because their grievance is common to members of the public, thus they do not have a particularized injury sufficient for Article III standing. CREW-Opp'n, ECF No. 18 at 9; Protect Democracy Opp'n,

ECF No. 19 at 9; CREW-Sur-Reply, ECF No. 22 at 2. In support, Defendants cite *United States v. Richardson*, 418 U.S. 175 (1977), where the Supreme Court held that a taxpayer lacked standing to challenge an alleged "failure of the Congress to require the Executive to supply a more detailed report of the expenditures of [an] agency." *Id.* at 175.

The Court concludes that Defendants' reliance on *Richardson* is misplaced. First, the mere fact that all members of the public have the same injury "does not render the claim an impermissible generalized grievance." *Pub. Citizen, Inc.* 489 F.3d at 1292; *see also Pub. Citizen*, 491 U.S. at 449-50; *EPIC*, 266 F. Supp. 3d at 311. Second, each Plaintiff has articulated how their injuries are particularized. *See* CREW Hr'g Tr., ECF No. 24 at 19:5-18 (explaining that CREW's particularized injury is that by being deprived of the information it "cannot effectively do its work in monitoring and disseminating to the public any issues about potential misuses of government spending"); *id.* at 17:16-24 (explaining that Protect Democracy's particularized injury is that by being deprived of the apportionment information, it can no longer populate the OpenOMB website it spent ten months building to make that information more searchable and user-friendly as part of Protect Democracy's core mission to protect the American government from becoming authoritarian). Accordingly, the Court rejects Defendants'

argument: Plaintiffs have established that they have a
particularized injury sufficient for Article III standing.

### d. Informational Standing Does Not Require the Underlying Statute to Provide for a Private Right of Action

Defendants argue that this case is distinguishable from
other informational standing cases because, unlike here, the
underlying statutes in those cases included an explicit private
right of action or had "hallmarks" indicating that Congress
meant to confer informational standing to potential plaintiffs.
*See* CREW-Sur-reply, ECF No. 221 at 3; CREW Hr'g Tr., ECF No. 24
at 57:1–14, 60:7–63:10. Thus, Defendants contend, to the extent
that the Acts require public disclosure of apportionment
information, it is merely "ancillary" and "does not rise to the
level of evincing a level of intent to establish a forum in
federal courts to allow private individuals . . . to demonstrate
Article III standing sufficient under the [D.C.] [C]ircuit's
informational standing test . . . ." CREW Hr'g Tr., ECF No. 24
at 111:8–18.

The Court concludes that the lack of an express private
right of action in the 2022 and 2023 Acts is not fatal to
Plaintiffs' claim that they have informational standing.
Defendants have failed to point to any authority suggesting that
the Court of Appeals for the District of Columbia ("D.C.
Circuit") requires a public disclosure statute to include a

private right of action for a plaintiff to establish informational standing. Rather, courts have concluded that plaintiffs have informational standing where, as here, the underlying statute did not include a private right of action. *See Pub. Citizen*, 491 U.S. at 449–50 (the Federal Advisory Committee Act ("FACA")); *Ctr. for Biological Diversity*, 77 F.4th at 686 (the Sunshine Act); *Env't Def. Fund v. EPA*, 922 F.3d 446 (D.C. Cir. 2019) (Toxic Substance Control Act). Moreover, courts examining whether plaintiffs had informational standing in Federal Election Campaign Act ("FECA") cases—where there is an express private right of action—focused on whether the statute conferred a right to information, not a right to sue. *See, e.g.*, *Campaign Legal Ctr.*, 31 F.4th at 790 (concluding plaintiffs suffered an informational injury where FECA required disclosure of specific campaign finance data); *Ctr. for Resp. & Ethics in Wash. V. Fed. Election Comm'n*, No. 22-cv-3281, 2023 WL 6141887, at *5–6 (D.D.C. Sept. 20, 2023) (emphasizing that "FECA creates an informational right").

Further, Defendants' claim that the disclosure requirement is "ancillary" because it was a rider in a large appropriations bill, *see* CREW Hr'g Tr., ECF No. 24 at 66:5-12; is wholly without merit. Defendants cite no authority where a court has ever held a law to be less forceful because it was passed as part of a larger piece of appropriations legislation. The

requirement is the law, now codified as part of the Anti-Deficiency Act. *See* 31 U.S.C. § 1513 note.

### e. Plaintiffs Do Not Have an Adequate Alternative Source for Obtaining the Information

Finally, Defendants argue that Plaintiffs have alternative sources for obtaining the apportionment information such as submitting FOIA requests, or consulting other government databases and government reports that contain information about the Executive's spending decisions. *See* CREW-Opp'n, ECF No. 18 at 33. The Court agrees with Plaintiffs that these are not adequate alternatives. Although it is true that "a plaintiff cannot establish injury based on information that is already available 'from a difference source,' disclosure of which would only result in duplicative reporting,'" *Campaign Legal Ctr.*, 31 F.4th at 790 (quoting *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001)); none of Defendants' proposed alternatives provide Plaintiffs with timely information on each apportionment decision in the Open Government Data Asset format required.

Nor would any of Defendants' proposed alternatives provide the information in the required format within a two-day time frame. For example, the SF 133 Report on Budget Execution and Budgetary Resources is a quarterly report, *see* OMB Circular A-11 § 130.1; and the Financial Report of the United States government is a PDF document that is issued annually, *see* Dept.

34

of the Treasury, Financial Report of the U.S. Government,
https://www.fiscal.treasury.gov/reports-statements/financial-
report/current-report.html (last visited May 14, 2025).

Although Defendants point to the statutory deadlines in
FOIA, they fail to acknowledge that those deadlines are rarely,
if ever met, and that it can take months and even years for a
party to actually receive documents. Furthermore, to obtain this
information via FOIA requests, Plaintiffs would need to make
never-ending, recurring FOIA requests, and the information would
be provided in PDF-format documents. Also, given Defendants'
argument that the apportionment information is predecisional and
deliberative, they would likely invoke exemptions that would
result in litigation, further delaying Plaintiffs' access to the
information. In sum, Congress was well aware of the alternative
sources of information when it enacted the disclosure
requirements in the 2022 and 2023 Acts but chose to require the
establishment of the Public Apportionments Database, thereby
indicating that Congress did not view the alternatives as
adequate.

### 2. Protect Democracy is Also Suffering Economic Injuries

Protect Democracy also argues that it is suffering economic
injuries because the removal of the apportionment information
has diminished the value of its investments in the OpenOMB

database. Protect Democracy Reply, ECF No. 20 at 11-13.
Defendants respond that Protect Democracy "cannot base an
informational injury on its decision to establish a business
around [c]ongressional oversight." Protect Democracy-Surreply,
ECF No. 21 at 4. However, Protect Democracy contends that this
is an organizational injury, not an informational injury, that
"impacts [its] ability to carry out its core mission" and "is a
direct economic injury based on time and money already spent."
CREW Hr'g Tr., ECF No. 24 at 10:8-15. Protect Democracy explains
that "OpenOMB is now of considerably less value because it
cannot serve its core function of making it easier to track
OMB's apportionments." Ex. A, Supp. Decl. of William P. Ford
("Protect Democracy-Ford Supp. Decl.), ECF No. 20-1 in 25-cv-
1111 ¶ 2(a). "OpenOMB is now only an archive of apportionments
from a fixed period of time" in the past, *id.*; rather than
serving the purpose for which Protect Democracy invested
substantial money and resources in it—to "make oversight of
OMB's apportionments easier for Congress, the press, and the
public" on an ongoing basis, *see AboutOpenOMB*, OPENOMB,
https://OpenOMB.org/about (last visited May 27, 2025). The Court
concludes that the diminution of the value of the investment in
OpenOMB is a cognizable economic injury. *See Village of
Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262
(1977) (finding cognizable economic injury where a nonprofit

corporation "expended thousands of dollars" on certain plans, which would be "worthless" unless the request at issue in the case was granted).

### 3. Plaintiffs Have Established the Requisite Causal Connection and Redressability

Defendants do not contest causal connection or redressability, both of which are easily met here. Plaintiffs' injuries are traceable to Defendants' removal of the Public Apportionments Database, and a favorable ruling will resolve Plaintiffs' injuries by reinstating their access to the apportionment data. For all these reasons, the Court concludes that Plaintiffs have established that they have Article III standing, with the exception of CREW as to its notice claim under the PRA.

### B. The 2022 and 2023 Acts Do Not Unconstitutionally Infringe Upon Executive Power

"The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983). The Constitution vests in Congress the exclusive power to appropriate funds, *see* U.S. CONST. art. I, § 9, cl. 7; and in the Executive the exclusive power to "take Care that the Laws be faithfully executed," U.S. CONST. art.

II, Sec. 3. Pursuant to its appropriations power, "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." *Richardson*, 418 U.S. at 178 n.11. The President's constitutional obligation "does not permit [him] to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974).

Defendants do not dispute that they are not complying with the 2022 and 2023 Acts: they removed the Public Apportionments Database from the OMB website on or around March 24, 2025, and now argue to the Court that the relevant provisions of the Acts are unconstitutional. At oral argument, Defendants clarified that their argument is that the 2022 and 2023 Acts are unconstitutional on the following grounds: (1) they impair the ability of the Executive Branch to take care that the laws are faithfully executed and impermissibly interfere with the Executive Branch's role; and (2) they require the disclosure of information that is subject to executive privilege. CREW Hr'g Tr., ECF No. 24 at 78:16-79:3.

**1. The 2022 and 2023 Acts Do Not Impair the Ability of the Executive Branch to Take Care That the Laws are Faithfully Executed nor Do They Impermissibly Interfere in the Executive Branch's Role**

Defendants claim that requiring the disclosure of the apportionment information "impair[s]" the Executive's performance of its duties and interferes with its role for several reasons. First, they argue that it amounts to Congress having an active role in the execution of the appropriations laws. CREW-Opp'n, ECF No. 18 at 24. The Court rejects this argument. As explained in greater detail below, the 2022 and 2023 Acts require the public disclosure of OMB's final apportionment decisions; they do not amount to congressional involvement in the administration of the appropriation.

Defendants further argue that requiring the disclosure of the apportionment information has a "chilling effect on OMB's decision-making" in that the 2022 and 2023 Acts require them to: (1) "omi[t] [] key details regarding the agency action it seeks prior to making funds available for disbursement"; (2) "remove[] sensitive information from apportionment documents [resulting in] imped[ing] OMB's ability to most efficiently provide direction to and receive information from agencies"; and (3) "omit important context that could reveal information about the Executive Branch's internal planning and strategy." *Id.* at 28 (citations and quotations omitted); *see also* CREW Hr'g Tr., ECF

No. 24 at 75:7-15. Defendants further argue that the requirement
to publish the information within two business days
"impermissibly burdens the administration of the apportionment
process" and that as a result of the expedited timeline, they
are "often forced to omit key policy information from
apportionments." CREW-Opp'n, ECF No. 18 at 28-29. Defendants
point to the FOIA process and the accommodation process for
congressional requests for information and subpoenas as being
preferable to the two-day timeline required by the 2022 and 2023
Acts. *Id*. at 29.

The Court concludes that Defendants' objections are a
policy disagreement with the 2022 and 2023 Acts without a
constitutional foundation. After the 2022 Act was signed into
law in March 2022, the Biden Administration complied with it and
the 2023 Act: OMB's then-General Counsel, who "participated in
setting up the automated apportionment posting system required
by the statute" and "advised OMB's budget staff on compliance
with the statute" avers that in his experience, "compliance with
the apportionment transparency law was straightforward, did not
interfere with the President's constitutional or statutory
responsibilities or OMB's supervision of the Executive Branch,
and was fully consistent with effective and efficient
governance." CREW-Bagenstos Decl., ECF No. 9-4 ¶ 7. At bottom,
Defendants are complaining about the extra work the 2022 and

2023 Acts require. This is a management issue; not a constitutional one.

Defendants claim—without citing any authority—that congressional "[o]versight generally is something that Congress engages in to inform future legislation" and that the automatic publication requirement in the 2022 and 2023 Acts is "miles away from the traditional oversight request or generic reporting requirement." CREW Hr'g Tr., ECF No. 24 at 87:9-12, 88:1-2. This argument is without merit: "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest." *Richardson*, 418 U.S. at 178 n.11. Here, Congress has determined that OMB's apportionment decisions should be publicly available so that, among other things, it and the public can see whether they are consistent with congressional appropriations. As such, the 2022 and 2023 Acts aid Congress's exercise of its undisputed oversight role. The Acts do not dictate how OMB should apportion funds, nor do they establish a congressional management role in the administration of apportionments. The Acts merely require that the final apportionment decisions be made publicly available to provide transparency to Congress and the public.

For all these reasons, the Court rejects Defendants' arguments that the 2022 and 2023 Acts impair the ability of the Executive Branch to take care that the laws are faithfully

executed or impermissibly interfere in the Executive Branch's role.

### 2. The Deliberative Process Privilege as a Form of Executive Privilege Does Not Apply to the Information at Issue, and the Apportionment Documents are not Deliberative, Predecisional Documents

"The most frequent form of executive privilege raised in the judicial arena is the deliberative process privilege; it allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.C. Cir. 1997)). "Although this privilege is most commonly encountered in [FOIA] litigation, it originated as a common law privilege." *Id.* (citing *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988)). "Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative." *Id.* (citing *Army Times Publ'n Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993)). "The deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need." *Id.*

Another form of executive privilege is the presidential communications privilege, a privilege that was "definitively established as a necessary derivation from the President's constitutional status in a separation of powers regime" arising out of the "Watergate-related lawsuits seeking access to President Nixon's tapes as well as other materials." *Id.* at 739-40.

Defendants assert that the 2022 and 2023 Acts require the disclosure of predecisional, deliberative information. CREW-Opp'n, ECF No. 18 at 28. At oral argument, Defendants argued that this makes the 2022 and 2023 Acts unconstitutional because the deliberative process privilege is a form of executive privilege, which, because it is "grounded and rooted in the separation of powers," cannot be abrogated by Congress. CREW Hr'g Tr., ECF No. 24 at 76:12-16. Consequently, according to Defendants, the 2022 and 2023 Acts are unconstitutional because they require the disclosure of privileged information. *Id.* at 78:16-18. Defendants hinted at this argument in their briefing materials by asserting that "[t]he deliberative process privilege—the most common executive privilege—is a privilege grounded in the separations of powers." CREW-Opp'n, ECF No. 18 at 26. However, the D.C. Circuit case they cite as supporting this assertion nowhere mentions the deliberative process privilege as being grounded in separation of powers. *See*

43

*generally Jud. Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49
(D.C. Cir. 2021). Rather, D.C. Circuit authority is clear that
the deliberative process privilege is primarily a common law
privilege. *See In re Sealed Case*, 121 F.3d at 737. Defendants'
support at oral argument for their remarkable proposition is
*United States v. Nixon*, 418 U.S. 683 (1974), a case which
involved presidential privilege (and which they failed to cite
in their briefing materials). *See* CREW Hr'g Tr., ECF No. 24 at
120:25-121:2. There is no evidence in the record remotely
supporting the notion that the apportionment documents are
presidential communications or are in any way subject to the
presidential communications privilege. Accordingly, the Court
rejects this constitutional claim.

Aside from their constitutional argument, Defendants argue
that the apportionment information cannot be disclosed because
it is deliberative, predecisional information. The Court also
rejects this argument. The information on the Public
Apportionments Database is neither predecisional nor
deliberative because apportionments, including footnotes, are
final "OMB-approved plan[s]" that are "legally binding." OMB
Circular No. A-11 § 120.1; *see id*. § 20.3 (stating that an
"[a]pportionment is a plan, approved by OMB, to spend
resources"). Defendants cite no precedent supporting the
proposition that a legally binding document is predecisional and

44

deliberative. Nor do they cite any prior instance in which OMB has claimed that an apportionment document is privileged. That Defendants' current position has never been previously claimed by OMB is consistent with Mr. Bagenstos's testimony:

> [Director Vought's] assertion [that 'apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change'] fundamentally misunderstands both the nature of apportionments and what it means to be 'predecisional.' Apportionments are not part of the give and take that precedes a binding legal decision; they are the binding legal decisions themselves.

CREW-Bagenstos Decl., ECF No. 9-4 ¶¶ 10-11 (quoting OMB Letter at 22); *see also* OMB Circular A-11 § 120.1.

Defendants also argue that in the Anti-Deficiency Act, "Congress afforded the President authority to apportion funds as he 'considers appropriate,'" and that apportionments are an iterative process subject to change. CREW-Opp'n, ECF No. 18 at 25 (quoting 15 U.S.C. § 1512(b)(2)). Consequently, according to Defendants, the interim apportionment decisions are privileged. The Court rejects this argument for the same reason as discussed above—even if an apportionment is later changed, this does not alter the legally binding nature of the apportionment once it is made.

Similarly, Defendants' argument that OMB remains free to change apportionments does not make the information predecisional and deliberative. No matter how many times an apportionment changes, each generated apportionment is "legally binding," creating administrative and criminal consequences under the Anti-Deficiency Act. *See* OMB Circular A-11 §§ 120.1, 145.1. A review of examples of apportionment decisions confirms that the documents are not deliberative. *See* OMB Circular A-11, Ex. 4, ECF No. 18-7 in 25-cv-1111 at 37-58. Nothing within the apportionment decision shows OMB officials' discussions or thoughts about any policy considerations regarding how to apportion appropriated funds. *Id.* Finally, there is ample authority in support of the proposition that because an agency can change its decision, this does not make the decision any less final. *See e.g., U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 271 (2021) (emphasizing that document is a "final" decision outside the scope of the deliberative process privilege if it has "real operative effect" leading to "direct and appreciable legal consequences"); *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."). For all these reasons, the information at issue is neither predecisional nor deliberative.

By removing the Public Apportionments Database, Defendants have acted contrary to the 2022 and 2023 Acts. For the reasons explained above, the applicable provisions of the 2022 and 2023 Acts are not unconstitutional. Accordingly, the Court will grant Plaintiffs' Motions for Partial Summary Judgment as to their respective APA claims.

### C. CREW is Entitled to Summary Judgment on its Dissemination of Public Information Claim Under the PRA

The Court also concludes that CREW is entitled to summary judgment on its dissemination of public information claim under the PRA. Defendants' removal of the Public Apportionments Database violates the PRA's requirement to provide the public with timely access to the information. *See* 44 U.S.C. § 3506(d)(1). As CREW points out, "Defendants do not dispute that the apportionment information in the database is 'public information' within the meaning of the [PRA], and they do not dispute that the information's removal deprives the public of timely access, as required by that statute." CREW Reply, ECF No. 21 at 17. Defendants' only argument in response is that "the apportionment documents are interim, deliberate documents that are exempt from public disclosure." CREW-Opp'n, ECF No. 18 at 31. However, for the reasons explained above, the Court rejects this argument. Accordingly, the Court will grant CREW's Motion

for Partial Summary Judgment as to its dissemination of public information claim under the PRA.

### D. Remedies

Given the Court's conclusion that Defendants' removal of the Public Apportionments Database is contrary to law, the Court turns to the question of remedies. CREW and Protect Democracy request that the Court: (1) vacate and set aside Defendants' actions; (2) declare Defendants' actions unlawful; and (3) enter a permanent injunction prohibiting Defendants from removing the Public Apportionments Database in the future. *See* CREW Suppl., ECF No. 28 at 2; Protect Democracy Suppl., ECF No. 28 at 3.

#### 1. Declaratory Relief

Under the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Whether to issue declaratory relief "always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). There are many factors relevant to whether declaratory relief is necessary, but "[i]n the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving

rise to the proceeding." *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016) (citing *Vance*, 627 F.2d at 364 n.76).

Defendants argue that Plaintiffs are not entitled to declaratory relief because the apportionment documents are predecisional and deliberative, but they fail to address whether a declaratory judgment would be improper if the Court rules in Plaintiffs' favor. *See* Defs.' Suppl.—CREW, ECF No. 29 at 2; Defs.' Suppl.—Protect Democracy, ECF No. 29 at 2. The Court rejected Defendants' predecisional and deliberative arguments above and concludes that it will exercise its discretion to award declaratory relief. Declaratory relief clarifies for the parties—and the public—that Defendants' knowing violation of the disclosure requirement in the 2022 and 2023 Acts is not legally justified by Executive powers or privileges. Importantly, a declaration provides authority on the central question in this litigation and guidance on what Defendants must do to comply with the law.

### 2. Vacating and Setting Aside Unlawful Conduct

Plaintiffs also request that the Court vacate and set aside Defendants' unlawful action by ordering Defendants to "restor[e] the database and mak[e] the apportionment information publicly available." CREW Suppl., ECF No. 28 at 3; Protect Democracy Suppl., ECF No. 28 at 3-4. Defendants assert that vacatur is not

available here, but provide no argument in support of the
assertion based on the case they cite. *See* Defs.' Suppl.—CREW,
ECF No. 29 at 5 (citing *United States v. Texas*, 599 U.S. 670,
692-93 (2023) (Gorsuch, J. concurring)); Defs.' Suppl.—Protect
Democracy, ECF No. 29 at 5 (citing *Texas*, 599 U.S. at 692-93
(Gorsuch, J. concurring)).

Title 5 U.S.C. § 706(2)(A) directs courts to "hold unlawful
and set aside agency action" that is "not in accordance with
law[.]" 5 U.S.C. § 706(2)(A). "[T]o 'set aside' a rule is to
vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890
(D.C. Cir. 2024) (quoting *Corner Post, Inc. v. Bd. of Governors*,
603 U.S. 799, 830 (2024) (Kavanaugh, J. concurring)). Thus,
"[w]hen an agency's action is unlawful, 'vacatur is the normal
remedy.'" *Id.* (quoting *Allina Health Servs. v. Sebelius*, 746
F.3d 1102, 1110 (D.C. Cir. 2014)). The D.C. Circuit has held
that remand without vacatur is proper "if an agency's error is
'curable.'" *Id.* (citing *U.S. Sugar Corp. v. EPA*, 844 F.3d 268,
270 (D.C. Cir. 2016)) (emphasizing that remand without vacatur
is an "exceptional remedy"). "Because an agency can't 'cure' the
fact that it lacks authority to take a certain action," *id.*; the
Court concludes that vacatur is proper here. As discussed above,
Defendants' removal of the Public Apportionments Database
clearly violates the 2022 and 2023 Acts, and Defendants have no
legal basis for failing to comply with the Acts. Accordingly,

the Court will vacate and set aside Defendants unlawful action
pursuant to the APA.

### 3. Permanent Injunction

Finally, Plaintiffs request that the Court permanently
enjoin Defendants from removing the Public Apportionments
Database and the apportionment information required to be
disclosed by the 2022 and 2023 Acts without statutory
authorization. *See* CREW Suppl., ECF No. 28 at 3-5; Protect
Democracy Suppl., ECF No. 28 at 4-5.

A court may issue a permanent injunction where, in addition
to establishing that it is entitled to prevail on the merits, a
plaintiff demonstrates:

> (1) that it has suffered an irreparable
> injury; (2) that remedies available at law,
> such as monetary damages, are inadequate to
> compensate for that injury; (3) that,
> considering the balance of hardships between
> the plaintiff and defendant, a remedy in
> equity is warranted; and (4) that the public
> interest would not be disserved by a permanent
> injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In
determining whether a permanent injunction is a proper remedy,
courts in this district have considered the first two factors
together. *See, e.g.*, *Grundmann v. Trump*, No. 25-cv-425, 2025 WL
782665, at *13 (D.D.C. Mar. 12, 2025); *Wilcox v. Trump*, No. 25-
cv-334, 2025 WL 720914, at *15 n.20 (D.D.C. Mar. 6, 2025);
*Ridgely v. Lew*, 55 F. Supp. 3d 89, 97 (D.D.C. 2014). And because

the government is the defendant, "factors (3) and (4) merge."
*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal
Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (citing *Nken v.
Holder*, 556 U.S. 418, 435 (2009)).

Defendants argue that Plaintiffs cannot meet the
requirements for a permanent injunction because: (1) they have
failed to establish irreparable harm; and (2) the balance of
hardships in factors three and four tip in favor of the
government "because any injunctive relief in this case would
require unconstitutional infringement upon Executive power."
Defs.' Suppl.—CREW, ECF No. 29 at 3-4; Defs.' Suppl.-Protect
Democracy, ECF No. 29 at 4.

### a. Irreparable Harm and Inadequate Remedy at Law

Examining the first two factors together, the Court
concludes that CREW and Protect Democracy have suffered
irreparable harms that cannot be fully repaired absent an
injunction.

To establish an irreparable injury, a plaintiff must show
that the injury is "both certain and great" and "actual and not
theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454
F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*,
758 F.2d 669, 674 (D.C. Cir. 1985)). An organization satisfies
the "irreparable harm" prong "if the actions taken by [the

defendant] have 'perceptibly impaired' the [organization's] programs." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (alteration in original) (internal quotation marks omitted) (quoting *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).

The Court concludes that CREW and Protect Democracy's inability to continue their work monitoring and reporting on the Executive Branch's use of congressionally appropriated funds due to Defendants' removal of the Public Apportionments Database is an irreparable injury. Defendants argue that CREW has failed to demonstrate that the apportionment information "is indispensable to its core mission and that impaired access prevents it from fulfilling its organizational goals." Defs.' Suppl.—CREW, ECF No. 29 at 3-4. The Court disagrees. Without the database, CREW is unable to evaluate ongoing concerns regarding ICA violations or provide the public with insight into how the Executive is spending funds. *See* Wentworth Decl., ECF No. 9-3 ¶¶ 6-10. As to Protect Democracy, in addition to the harm to its organization's mission of "monitoring and reporting on the Executive Branch's compliance with Congress's directives and making that

information more accessible to the public," Protect Democracy Mot., ECF No. 18 at 23; Protect Democracy's asserted economic loss stemming from the inability to maintain OpenOMB constitutes an irreparable injury.

When Defendants removed the Public Apportionments Database, they deprived CREW and Protect Democracy of information to which they are statutorily entitled, and which they relied on to monitor government funding, respond to possible legal violations, and provide transparency to the public. *See* Wentworth Decl., ECF No. 9-3 ¶¶ 14-16; Ford Decl., ECF No. 18-4 ¶¶ 19-22. The irreparable nature of these injuries is further supported by the fact that there are ongoing, imminent concerns of potential Executive Branch withholding or overspending. *See, e.g.*, GAO, *Institute of Museum and Library Services-Applicability of the Impoundment Control Act to Reduction of Agency Functions*: Decision File B-337375 (June 16, 2025), https://www.gao.gov/assets/880/878908.pdf. CREW and Protect Democracy cannot continue their efforts because they no longer have timely access to apportionment information as required by the 2022 and 2023 Acts.

Furthermore, the Court concludes, and Defendants do not dispute, that remedies at law are inadequate to compensate for these injuries. Monetary damages would not provide Plaintiffs with the apportionment information, nor would it allow

Plaintiffs to fulfill their missions of educating the public and Congress about how the Executive Branch is allocating congressionally appropriated funds. Not only does a permanent injunction ensure that Plaintiffs regain access to the Public Apportionments Database, but it also prohibits Defendants from removing the database or failing to comply with the 2022 and 2023 Acts in any other way in the future.

### b. Public Interest and Balance of Hardships

Finally, the Court concludes that the public interest and balance of hardships weigh in favor of issuing a permanent injunction. Relying on its constitutional arguments that the 2022 and 2023 Acts infringe upon the Executive power, Defendants argue that these factors weigh against injunctive relief. *See* Defs.' Suppl.—CREW, ECF No. 29 at 4; Defs.' Suppl.—Protect Democracy, ECF No. 29 at 4.

The Court has already considered and rejected Defendants' arguments that the 2022 and 2023 Acts are unconstitutional. As explained above, Defendants' removal of the Public Apportionments Database violates the law and, contrary to Defendants' argument, their conduct is not justified by Executive power or privilege. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.

2013)). Moreover, OMB complied with the disclosure requirements for nearly three years before it removed the Public Apportionments Database, further diminishing any argument that complying with the disclosure requirement is overly cumbersome or places an impossible burden on Defendants.

A permanent injunction requiring Defendants to maintain the Public Apportionments Database as required by law directly serves the "substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (internal quotation marks omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). This interest is also directly advanced by enforcing the disclosure requirements in the 2022 and 2023 Acts. As Congress intended when enacting the disclosure requirements, the Public Apportionments Database provides the public and their elected representatives with timely insight on how the Executive Branch is allocating taxpayer dollars. *See* GAO, Impoundment Control Act of 1974: Review of the President's Special Message of June 3, 2025, B-337581 (June 17, 2025), https://www.gao.gov/assets/880/878941.pdf ("Restoring [the Public Apportionments Database] and providing timely access to the apportionment information we request would enhance [Congress's] oversight and [the GAO's efficiency in supporting Congress."). The Public Apportionments Database provides the

public with information about whether the Executive Branch is abiding by the laws governing the allocation of public funds, thereby enabling the public to hold the Executive Branch accountable if there is a misuse of appropriated funds.

For all these reasons, the balance of hardships and the public interest favor granting a permanent injunction.

### E. Plaintiffs' Remaining Claims

While Plaintiffs' Complaints include additional challenges to Defendants' removal of the Public Apportionments Database, *see* CREW Compl., ECF No. 1 ¶¶ 26-29; Protect Democracy Compl., ECF No. 1 ¶¶ 51-77; Plaintiffs agree that the Court's decision here—granting each form of requested relief—provides Plaintiffs with complete relief. *See* CREW Suppl., ECF No. 28 at 5-6; Protect Democracy Suppl., ECF No. 28 at 8. Accordingly, the Court exercises its discretion to dismiss without prejudice the remainder of CREW and Protect Democracy's claims as prudentially moot. *See City of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (explaining that "prudential mootness" "does not concern a court's power to grant relief, but rather its exercise of discretion in the use of that power"); *Ctr. for Biological Diversity v. Regan*, 729 F. Supp. 3d 37, 52 (D.D.C. 2024) ("The practice [of not deciding more than it must] permits courts to avoid the pointless . . . task of deciding a broad array of legal and factual issues . . . that, in the parlance of

mootness, will 'make [no] difference to the legal interests of
the parties[.]'" (quoting *Air Line Pilots Ass'n v. UAL Corp.*,
897 F.2d 1394, 1396 (7th Cir. 1990))).

### F. Stay Pending Appeal

In the event the Court awarded Plaintiffs' requested
relief, as it has done here, Defendants' supplemental briefing
requests a stay of any permanent injunction pending appeal. *See*
Defs.' Suppl.—CREW, ECF No. 29 at 5. Defendants' request is
premature because at the time it was made, the Court had not yet
ruled on Plaintiffs' motions. Accordingly, the Court **DENIES**
without prejudice Defendants' request for a stay pending appeal.
If, after considering the Court's Memorandum Opinion and Order,
Defendants decide to renew this request, they may make a request
consistent with Federal Rule of Appellate Procedure 8.

In the alternative, Defendants request that the Court issue
a fourteen-day administrative stay "to allow for the Solicitor
General to determine whether to appeal and seek a stay pending
appeal." Defs.' Suppl.-CREW, ECF No. 29 at 6. A court may issue
a brief "administrative stay" to "buy the court time to
deliberate when issues are not easy to evaluate in haste." *Nat'l*
*Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16–17 (D.D.C.
2025) (quoting *United States v. Texas*, 144 S. Ct. 797, 798
(2024) (Barrett, J. concurring) (internal quotation marks
omitted)). "While administrative stays are more common in

appellate courts, district courts have recognized their applicability in cases seeking emergency relief under the APA." *Id.* (citing Order, *Texas v. Dep't of Homeland Sec.*, No. 24-cv-306, at *2 (E.D. Tex. Aug. 26, 2024)) (noting that the authority for an administrative stay stems from the All Writs Act and the court's authority to manage its docket). Neither CREW nor Protect Democracy oppose a brief administrative stay. *See* CREW Suppl. Reply, ECF No. 30 at 4; Protect Democracy Suppl. Reply, ECF No. 31 at 5.

To allow Defendants time to review the Court's Memorandum Opinion and Order, and to allow the parties to properly brief any forthcoming, procedurally proper motion for a stay pending appeal, the Court administratively stays the permanent injunction for three days, until 10:00 am on July 24, 2025.

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** CREW's Motion for Partial Summary Judgment as to its APA claims that the Defendants' removal of the Public Apportionments Database violates the 2022 and 2023 Acts and the PRA's dissemination of information requirement, and **DENIES IN PART** CREW's Motion for Partial Summary Judgment as to its APA claim that Defendants' conduct violated the PRA's notice requirement, ECF No. 9 in 25-cv-1051. The Court **GRANTS** Protect Democracy's Motion for Partial Summary Judgment on its APA claim that Defendants' removal of

the Public Apportionments Database violates the 2022 and 2023

Acts, ECF No. 18 in 25-cv-1111. The Court **DENIES AS MOOT**

Plaintiffs' Motions for a Preliminary Injunction, ECF No. 9 in

25-cv-1051 and ECF No. 18 in 25-cv-1111. The Court **DISMISSES**

**WITHOUT PREJUDICE** Count One of CREW's Complaint as prudentially

moot. The Court **DISMISSES WITHOUT PREJUDICE** Counts Two through

Six of Protect Democracy's Complaint as prudentially moot.

The Court **DENIES WITHOUT PREJUDICE** Defendants' request for

a stay pending appeal and enters an administrative stay through

10:00 am on July 24, 2025.

Separate, appropriate Orders for each case accompany this

Memorandum Opinion.

**SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
        **United States District Judge**
        **July 21, 2025**